E-FILED
Friday, 18 October, 2019  12:30:32 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 19-cv-4210 |
| | ) | |
| v. | ) | |
| | ) | |
| XAPT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Deere & Company ("Deere"), by and through its attorneys, Riley Safer Holmes & Cancila LLP, for its Complaint against Defendant XAPT Corporation ("XAPT"), alleges as follows:

## INTRODUCTION

1.     Deere brings this action against XAPT for breach of contract, fraudulent inducement arising out of XAPT's bait and switch tactics, and reformation of Amendment 1 to the contract.  To win a lucrative, decades-long development and licensing project with Deere, XAPT grossly misrepresented its system's capabilities and the cost to complete the project.  Only after the project began and Deere paid XAPT millions of dollars did it become clear that XAPT is either incapable of or has chosen not to perform at the requisite level, leaving Deere with nothing to show for it.

2.     In 2013, Deere decided to develop a state of the art global, integrated software system that its dealers in seven geographical locations around the globe could use to manage all aspects of their businesses, from sales and inventory, to tax and regulatory, to service and parts.

3.     Seeking to win the bid, XAPT promoted its depth of industry knowledge and experience, the robust and flexible nature of its software, its ability to easily modify its out-of-the-box template "to suit John Deere," and its expertise in global implementation and scaling up. XAPT represented its software solution, "NAXT," as a kind of software utopia: highly configurable and perfectly tailored to the heavy equipment market. XAPT told Deere that it could meet Deere's requirements with minimal development in eighteen months.

4.     These promises, and others, induced Deere to choose XAPT for a multi-phase, lucrative, decade-long contract.

5.     Despite XAPT's representations that it is an expert and global leader in software solutions, XAPT continually failed to deliver as required by the contract, and the current code contains exceptionally high numbers of defects. XAPT's poor performance has caused the project to take years longer, and millions of dollars more, than Deere had originally committed.

6.     In addition, XAPT's underhanded negotiation tactics resulted in a contractual amendment that the parties did not intend.

7.     To date, the software XAPT promised and Deere contracted for is still not available to a single Deere dealer.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and because the amount in controversy exceeds the sum of $75,000.

9.     Venue is proper in the Central District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claim occurred in the Central District of Illinois.

## THE PARTIES

10.     Plaintiff Deere & Company is a Delaware Corporation with its headquarters in Moline, Illinois.  Deere is engaged, among other things, in the business of delivering products and services to support those linked to the land, in line with its core values of integrity, quality, commitment, and innovation.

11.     Defendant XAPT Corporation is a Florida Corporation with its headquarters in Miami, Florida.  XAPT is a division of the New Frontier Group, a "fast-growing regional IT solutions player" headquartered in Vienna, Austria.  XAPT styles itself a "global leading provider of Microsoft Dynamics ERP business solutions" that "provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

## FACTUAL BACKGROUND

### A.  Deere Develops Strategy To Offer Dealers Single, Integrated, Global Dealer Business System

12.     Deere dealers run businesses involved in selling, renting, and servicing agriculture, turf, construction, and/or forestry equipment.  Deere dealers operate on six continents.

13.     Behind the scenes of a Deere dealer's business sit dozens of other functions, including marketing, accounting, tax, administrative, regulatory, human resources, information technology, inventory, data management, contract management, and subscription management, among many others.  Many of these functions are enabled by separate web applications.

14.     To bring multiple applications together such that information can flow among them (for example, linking inventory to parts purchases, or sales information to financial statements), dealers purchase a computer software system known as a "Dealer Business System," or "DBS."

15.     Deere has developed and offered its own DBS, which has been available in the United States, Canada, Mexico and Brazil.

16.     After extensive analysis and discussions with stakeholders and consultants, Deere determined in 2013 that it could better serve its dealers by developing a single, fully integrated DBS for purchase by all of its dealers in key markets.

17.     Deere's vision, informed by its own DBS experience, was to offer its dealers a fully integrated DBS that could be configured by market.  For example, an agriculture equipment Deere dealer in Mexico could select options applicable to that dealer, such as the Spanish language, agriculture equipment settings, and a Mexico regulatory function.  A Brazilian construction and forestry dealer could, by contrast, select Portuguese, construction and forestry, and Brazilian regulatory settings.  Technological advances had rendered Deere's own DBS difficult to expand, so Deere decided to start anew using updated technology.

18.     First, Deere developed a list of more than three hundred capabilities that the new DBS must have.  These capabilities fell into five functional areas: accounting, parts, rental, sales, and service.  The capabilities are currently offered by Deere's own DBS and span the operations of Deere dealers.  They include, for example, "Associate a file with an accounting ledger, account, PO [Purchase Order] or other," "Quickly and easily view available payment options for the customer prior to finalizing the invoice. Credit limits and restrictions should be easy to determine whether it is in house (accounts receivable) or outside financing (JDF)," and "Quickly and easily request, schedule and execute transportation events with two work orders to two different customers on two different machines on same transportation route."

4

19.     Next, Deere targeted seven markets: first Mexico, followed by Australia and New Zealand, and then Canada, the United States and its territories and possessions, Brazil, and Argentina.  Deere anticipated adoption by more than 200 dealers with more than 40,000 users.

20.     Finally, Deere determined that it needed a platform on which the system would be built, and a developer to create and implement the system, as well as provide ongoing support.

## B.  Selecting A Platform and A System Developer

21.     Because of the importance of the project and the longevity of the planned relationship, Deere took great care in selecting its platform provider and system developer for the global DBS.

22.     Deere began by sending a Request for Information ("RFI") to several potential platform providers on September 27, 2013.   Finalists in the RFI process were invited to demonstrate their platform capabilities.  After months of analysis and rigorous testing, including deep dive meetings to gauge capabilities, proof of concept projects to understand user experience, and discussions with stakeholders, Deere selected Microsoft as the provider of the platform on which the DBS would be built.

23.     To find its system developer—its "Independent Software Vendor"—Deere sent a Request for Proposal ("RFP") to potential providers on December 4, 2015.  As it did with selecting its platform provider, Deere rigorously analyzed and vetted its Independent Software Vendor prospects.  This process, which began in 2014 and ended with the execution of contracts with XAPT on June 26, 2017, had many facets, including multiple deep dive meetings, proof of concept projects, financial modeling, contract negotiations, and discussions with dealers and stakeholders.

## C.  XAPT and Deere's Extensive Pre-Contract Meetings and Discussions

24.     Deere and XAPT's relationship began with a telephone call in December 2015. From the inception of the relationship, and consistently over the next almost two years prior to

contract execution, Deere consistently described its development needs: a global DBS template, customizable by region, including more than three hundred enumerated capabilities, data migration from Deere's prior systems, full integration among its applications, and initial roll-out to dealers in seven countries.

25.     During the selection process, including at least nine meetings at Deere's office in East Moline, Illinois involving more than twenty XAPT representatives, XAPT grossly and consistently misrepresented the development required to adapt its system to meet Deere's capability requirements, the time it would require to complete the project, and its cost.

### 1.  March 1 – March 3, 2016 Deep Dive Meetings

26.     During deep dive meetings during the week of February 29, 2016 at XAPT's offices in Miami, Florida, Deere and XAPT used demonstration scripts to analyze the 300+ capabilities that the new DBS must have in comparison with the preconfigured, out-of-the-box capabilities of XAPT's NAXT software.

27.     A primary goal of the deep dive meetings was to determine the number of gaps in each subject matter area that would require coding to meet Deere's needs.  The heart of the meetings involved presentations by XAPT subject-matter experts, including Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, and Juliet Cheng.  Also present from XAPT were team leaders and salesmen, including Ralph Hunt, who oversaw the NAXT team, Sean Skiver, Chris Wittusen, and Daniel Enekes.

28.     Each XAPT subject matter expert spent hours presenting to Deere on NAXT's functionalities.  Through each of these presentations, as well as the entire deep dive process, XAPT's message was the same: NAXT could already perform the vast majority of capabilities on Deere's list, either out-of-the-box or with minimal configuration.  XAPT represented that there were only fifty gaps that would require coding/development.

29.     "Gaps" are desired services and/or functions that XAPT's system could not perform that would require development/coding.  Such development/coding is done utilizing "stories."  The number of stories needed to close a single gap varies, but closing 50 gaps generally requires more than 50 stories.

### 2. March 17, 2016 RFP Response

30.     On March 17, 2016, XAPT submitted its response to Deere's RFP.  XAPT's response contained several related documents, including an ERP Project Proposal, a draft Statement of Work, Draft Project Plans, and responses to dozens of questions Deere used to vet proposals.  In a "Certification and Authority Statement" signed by Ralph Hunt, XAPT's Chief Operating Officer and Frank Squeri, XAPT's Chief Finance Officer on the same date, XAPT agreed to be bound by the representations, terms and conditions contained in its Proposal.

31.     In XAPT's ERP Project Proposal dated March 17, 2016, it represented:

   a.   "We understand the size of this undertaking, we have developed implementation schedules for the template buildout and for each dealer size that are conservative in nature and allow for extensive time to undertake testing, training, and data migration."

   b.   "Create the Template – XAPT can undertake this activity with existing staff."

   c.   "XAPT Corporation is a global leading provider of Microsoft Dynamics ERP business solutions.  XAPT specializes in the development of industry specific solutions built on the Microsoft Dynamics AX ERP platform for the Heavy Equipment Distribution, Automotive and Wholesale/Distribution industries and provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

7

32.     In response to a Deere RFP questionnaire, XAPT stated that it "does not intend to subcontract any services - other than for the provision of data center services through Microsoft Azure, or as a method of engaging staff in locations where XAPT does not, or is not able to set up a local company and thus decides to use a service provider.  In such circumstances XAPT will consult with John Deere."

### 3. March 31, 2016 Proposal Presentation

33.     Ralph Hunt, Chief Operating Officer of XAPT, and Sean Skiver, Vice President of Business Development, reiterated these representations during a March 31, 2016 proposal presentation to Deere in Moline.  During this presentation, XAPT touted its industry knowledge, development qualifications, product, and commitment to Deere.  In short, XAPT presented itself as the ideal developer for Deere.

34.     XAPT emphasized its "extensive industry knowledge and experience," its "[h]istory of working with Equipment Manufacturers," and its "[e]xperience in implementing [its] solution globally."   XAPT represented that it focuses both "on the development and implementation of integrated software solutions tailored to the Heavy Equipment Industry," and that it understood the "added complexity of implementing systems in multiple countries, cultures and languages."

35.     For its product, XAPT touted the "functionally rich, highly flexible" nature of its software, the process of "[u]sing an existing template and methodology as a base to build on," and its ability to modify its existing template "to suit John Deere."   XAPT characterized its product and development capabilities in a manner that demonstrated its understanding of and commitment to meeting Deere's needs:

- "One database. One environment. Fully integrated. No redundancy.  From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."

8

- "The fully integrated solution for John Deere dealers."

- "XAPT offers a fully integrated solution that provides functionality across the entire dealership. From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."

- "The complex structures of equipment dealerships, their suppliers and customers, demand both global and local knowledge. We bring the reassurance of a fully integrated solution, tailored to equipment dealers, with an understanding of regional requirements, delivered by Award winning specialists. XAPT provides clients full visibility and control across every branch and subsidiary, wherever their location."

36.     Consistent with Deere's core value of commitment, XAPT promised to "be involved forever – not just the term of the project."

### 4. Proof Of Concept Presentations July 11-12, 2016

37.     At its Proof of Concept presentations to Deere on July 11-12, 2016, in Budapest, XAPT reiterated these themes: competence, responsiveness to Deere's needs, and ability to tailor its solution quickly and efficiently, with minimal development/coding.

38.     For example, XAPT demonstrated how it would tailor its system to handle an everyday dealer task: a customer orders an item in-store and pays for it at the cash register.  While the XAPT system originally took eleven minutes and dozens of "clicks" of the computer mouse to complete this task, XAPT quickly streamlined the process to take a fraction of the "clicks" and less than six minutes.  XAPT represented that its system was flexible enough to handle many such tasks in the same manner.

39.     Following all the meetings and a thorough review of XAPT's RFP response, Deere engaged XAPT as its Independent Software Vendor.  XAPT's first task as Independent Software Vendor was to develop the Global DBS template.

9

**D.**  **Contractual Framework For Creating The Global DBS**

40.    Four principal contracts govern the creation and development of the Global DBS:
(a) the Master Services Agreement dated June 26, 2017, as amended on June 27, 2018 and June
26, 2019 (the "MSA"); (b) the Work Order Template – Global Template dated June 26, 2017 (the
"Global Statement of Work" or "Global Template SOW"), as amended on February 11, 2019
("Amendment 1"); (c) the Work Order – Governance, dated June 26, 2017 (the "Governance
Statement of Work" or "Governance SOW"); and (d) the XAPT Subscription Delivery Agreement
("XSDA").

41.    The MSA establishes the framework for the parties' relationship, and the Global
Template SOW and the Governance SOW operate within this framework.  The Global Template
SOW governs the technical aspects of developing the Global DBS.  The Governance SOW
establishes structures for communication, project management, and quality control.  The XSDA
structures subscription-related services, and also contains warranties related to the product itself.

1. **Master Services Agreement**

42.    Under Sections 10.2 and 10.3, XAPT represents and warrants "that all Services will
comply with the requirements in each applicable SOW in conformance with good professional
practices and accepted industry standards," and "that it will provide sufficient Representatives to
perform the Services within the time frames agreed and that its Representatives have sufficient
skill, knowledge and training to perform the Services."  MSA §§ 10.2, 10.3.

2. **Global Template SOW**

43.    The Global Template SOW "sets forth the Services to be performed by [the Parties]
related to the NAXT 365 Solution."  It "represents the complete baseline for scope, Services,
Deliverables, and acceptance applicable to this project."  Global Template SOW § 2.2.

44.     Based on XAPT's estimates, the Project "indicates a roughly 18 month duration." Global Template SOW § 3.3.

45.     The Global Template SOW sets forth XAPT's understanding of the project, including that it "has been retained to develop a Global Template for the implementation of a Dealer Management System for Authorized Dealers globally."  Global Template SOW § 2.3.

46.     Section 3.2.2 requires XAPT to provide dedicated personnel in the following areas: Project & Executive Sponsor, Project Management, Solution Architecture, Functional Consultants, Technical Consultants, Data Migration Consultants, and Technical Writers, each with enumerated responsibilities.  Global Template SOW § 3.2.2.

47.     Under Section 4.1, XAPT "will provide all Deliverables and complete milestones by the respective target dates identified below."  Global Template SOW § 4.1.  These targets included a "go-live (acceptance of template)" date in all seven countries of April 12, 2019.  Global Template SOW App'x I.

48.     The Global Template SOW provides for XAPT to invoice based on time and materials, and XAPT estimated that the cost of the Global Template SOW would be $7,744,679. Global Template SOW § 6.1.

49.     As described in Section 2.1 of the Global Template SOW, the Appendices crystallize the scope of the project as well as its planned methodology and cost.

50.     Appendix A, Section A contained 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.  These capabilities include "functionality for each of the following areas (including but not limited to): Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."  Global Template SOW § 3.1.

51.     Appendix B listed the fifty gaps XAPT identified would require additional development in order to meet the core capabilities enumerated in Appendix A.  According to Appendix B, "Most of these forms, data and functionalities are available as standard in Dynamics 365[.]"

52.     Appendix C detailed 137 required integrations to Deere applications.

53.     Appendix E contains Service Level Agreements ("SLAs") and was created "to allow Deere to ensure that user experience and expectations are met as they pertain to speed and response times of the solution."  The SLAs "will be used to measure the quality, delivery, and overall performance of [XAPT] for customisations" and are "designed to achieve the following goals:

1.   On-time delivery of quality code that meets or exceeds requirements

2.   Appropriate amount of testing

3.   Timely response to identified problems

4.   Severity 1 [critical] and 2 [major] defects associated with supported Authorized Dealer processes will be fixed by [XAPT] prior to production release of the Authorized Dealer as defined by the acceptance criteria below."

54.     Under Appendix E, unless otherwise specified in an individual Work Order:

- The "Plan/Deliver Score target is 90%."  The Plan/Deliver Score is "the number of system changes delivered divided by the total number of mutually agreed upon system changes in original FDD on or before the defined milestone."

- The "Acceptance Testing Coverage target is 90%."  Acceptance Testing Coverage is "the number of acceptance tests executed divided by the total number of acceptance tests associated with the system changes in the original FDD delivered on or before the defined milestone."

- The "Quality Bar target," or "number of identified open defects associated with the customization as defined in the approved FDD delivered on, or before the defined milestone," is:

    i.   "No known Severity 1 [critical] defects

12

    ii.  No Severity 2 [major] defects without mutually agreed workaround and resolution plan for each related defect.

    iii.  Mutually agreed resolution plans for all Severity 3 [standard] and Severity 4 [minor] defects."

55.    Appendix E also provides an "established set of metrics designed for measuring the performance and User Experience for mutually agreed [dealer] business processes"—in other words, maximum processing time thresholds for everyday dealer tasks, such as "Retrieve a previously created parts order file." The established set of metrics is based on the processing times in Deere's current DBS.

56.    Appendix J "Supplier's Development Methodologies," states, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices." In particular, XAPT's "development methodology is based on sprints of 2 weeks, continuous integration, daily builds, with unit and functional testing as part of the daily operation." XAPT submits "every development . . . to a best practice validation using a Microsoft provided tool."

57.    The Agile method of software development is a highly collaborative, iterative approach to product development. It involves setting a list of prioritized requirements and completing the top priorities first. Work is completed in two-week sprints. After each sprint, the list of priorities is re-evaluated, and priorities often shift as the project progresses. Deere, as the customer for whom XAPT is developing a product, drives priority setting.

58.    Appendix M provides a total cost estimate for the project, as follows:

    a.  $13,604,800 under the Governance SOW

    b.  The following under the Build Global Template SOW

        i.  $3,780,770 for Template Build Configuration

        ii.  $727,584 for Template Build – Gaps

      iii.  $1,100,000 for Template Build – SD [Service Delivery]

      iv.  $1,986,325 for Template Build – JD Apps Integration (rest); and

      v.  $150,000 for Mexico Localization Development

### 3. **Governance SOW**

59.    The Governance SOW, effective for ten years, "defines the roles and responsibilities of both Parties, and establishes reporting mechanisms that are required to maintain an effective working relationship[.]"  Governance SOW §§ 2, 7.1.

60.    Sections 2.4 and 6.2, and Appendix B address the composition of XAPT's team, which included the following positions: Project Director, Project Manager, Project Scheduler, Quality Assurance (QA) Manager, Technical writers, Consultants, and Developers, etc. Governance SOW § 2.4.  The Project Director and Project Scheduler, as well as a Solutions Architect and Hungary Development Project Manager, are "Key Employees" under the Governance SOW.  Governance SOW App'x B.  The team also includes infrastructure and cloud support.  Governance SOW § 6.2.

61.    Appendix I "Supplier's Development Methodologies" reaffirms, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices."

### 4. **XSDA**

62.    XAPT makes the following representations and warranties under the XSDA:

- "the Product, Global Template and Subscription Services shall perform in accordance with the Specifications"  XSDA § 20.1;

- "all Services shall be performed in conformance with good professional practices and accepted industry standards"  XSDA § 20.2; and

- XAPT "will provide sufficient Representatives to perform the Services and its obligation hereunder within the time frames agreed and that its Representatives have sufficient skill, knowledge, experience, competence, skill and training to

perform the services and obligations as set forth in this Agreement."  XSDA § 20.3.

**E.  After Contract Execution, Gaps Multiply Exponentially and XAPT Fails to Deliver Project Deliverables, Produces Code Riddled With Errors, and Racks Up Costs**

63.     Once the project kicked off, it became apparent that XAPT grossly misrepresented the number of gaps required to bring its system in line with Deere's list of capabilities.  XAPT originally identified *fifty gaps* to produce the global DBS for all 7 countries, but that number became well *over six hundred* just to produce the Global DBS for Mexico, Australia, and New Zealand.

64.     Because XAPT is a purported industry leader, with experience making similar integrated systems for dealers in the same industry as Deere, this cannot be a harmless miscalculation.

65.     During the months following contract execution, including over a hundred meetings in which XAPT representatives traveled to Deere's office in East Moline, XAPT's gross miscalculation of the gaps became apparent, and, at the same time, XAPT failed to meet its code delivery requirements.

66.     XAPT's code development tasks are divided into component parts and placed into a deliverable timeline.  Each task component is a "story."  A typical story is assigned a point value between three and twenty-one, depending on the complexity of the development required to complete it.  The entire development project was estimated at 4,500 story points, to be delivered in increments of approximately 450 per month.

67.     Although the parties did not classify development tasks as stories with point values until later in the project, a conversion of early deliverables into this classification nomenclature is as follows: by February 2018, XAPT was supposed to have delivered 450 points; instead it only

delivered 61.  By March 2018, XAPT was supposed to have delivered 900 points, but it had only

delivered 159.  By April 2018, XAPT was 962 points behind schedule.

68.     Even more problematic than failing to deliver on time, the code is riddled with

defects (also known as "bugs") – errors in the code that prevent it from working properly.

69.     By April 2018, XAPT had delivered 388 points, 50 of which met the Defect Service

Level Requirements of Appendix E to the Global Template SOW and Appendix D to the

Governance SOW.

70.     The cost associated with these deliveries was also significantly higher than

expected.  On average, each point as of April 2018 had cost $1,235, as compared to XAPT's

estimate of $880 (as represented in Appendix M of the Global Template SOW), indicating that

XAPT's development took considerably longer than represented. Given that Deere paid based on

time and materials, this level of performance cost Deere significantly more than originally agreed.

## F.  Deere Invests In Training XAPT

71.     By April 2018, it became clear that XAPT was not adhering to the Agile project

methodology required by the Global Template SOW and the Governance SOW.

72.     Two key features of Agile project management methodology are its priority list and

its flexibility.  Priorities are re-adjusted at the close of every two-week sprint.  Deere, as the

customer buying the product, drives priority-setting.

73.     Contrary to the Agile model, XAPT was resisting priority-shifting, and was

providing Deere with stories that were not the highest priority.

74.     Deere sent its Manager of Development, Delivery, and Quality for the system to

Hungary from April 16-25, 2018 to train XAPT's developers on Agile project methodology in an

effort to support XAPT's commitment to use the Agile project methodology.

**G.** **Post-Training, Gaps Increase, Quality Does Not Improve, And XAPT Seeks A $10 Million Increase In Contract Price To Deliver The Same Product**

75.    By June 2018, the identified number of gaps requiring development had risen eight-fold, XAPT continued to deliver behind schedule, and its defect rate remained high.

76.    At this time, gaps had increased to a conservative estimate of more than 400, XAPT was 1,095 points behind schedule, and, of the gaps it did deliver, 56 of 77 contained defects.

77.    At the same time, XAPT requested an additional $10 million to account for the increase in identified gaps due to its own gross miscalculations, despite the same project scope—the capabilities in Appendix A to the Global Template SOW.

78.    After XAPT sought to exponentially increase the costs of the development project, the parties commenced six months of contentious negotiations to fix the price of the remaining work.

**H.** **Amendment 1 Creates Fixed Price For Remainder Of Development Project, and Ties Payment to Quality**

79.    The key features of Amendment 1 to the Global Template SOW were: (i) a fixed price for the remainder of the development project, (ii) a fixed number of 545 gaps XAPT would have to close, and (iii) payment tied to meeting quality and delivery performance metrics. Amendment 1 also added 49 gaps of new scope (included as part of the 545), for which Deere agreed to pay $1.179 million.

80.    Despite XAPT's purported expertise, the parties had identified hundreds of additional gaps that XAPT had failed to identify originally which were needed to achieve the original product capabilities.  However, in the interest of moving the project forward, Deere agreed to limit the number of gaps in Amendment 1 to 545, plus the service module gaps for the defined service capabilities for which the stories were being created during the negotiations of Amendment

17

1. In fact, Deere was paying XAPT for functional consulting to define service module gap requirements at that time.

81. To incentivize better performance by XAPT, the parties tied payment to quality: delivering 90% of the code for that month triggered a payment; eliminating Severity 1 and Severity 2 bugs triggered an additional payment; eliminating Severity 3 bugs triggered an additional payment; and completion of certain milestones triggered payment of a risk premium.

## I. **The Executed Version of Amendment 1 Does Not Reflect The Parties' True Agreement**

82. XAPT's President, Dejan Popovic, implied to Deere that there would be consequences for converting the hourly contract into a fixed price arrangement for the remaining deliverables.

83. In Amendment 1, Deere and XAPT re-negotiated only part of their relationship: the number of gaps, quality incentives, fixed prices for gap closing, and $1.179 million in additional project scope. These negotiations were necessitated by XAPT's gross miscalculation of the number of gaps that it would need to close in order to provide a system with the capabilities required in Appendix A. Deere, relying on XAPT's original estimate of 50 gaps, had not budgeted for the time and materials necessary to close the number of actual gaps, nor had Deere budgeted for the increased per-point cost of development work that was grossly above the estimates provided by XAPT. Deere and XAPT did not renegotiate other key aspects of the relationship, such as the capabilities required to bring the final DBS to market, or the $1.1 million allocated to integrating the Deere service module.

84. The text of Amendment 1 states, under "Amendment to Appendices," that the appendices in the Global Template SOW are "replaced" with the Amendment 1 appendices. The appendices of Amendment 1 included only the new scope in Appendix A and only the new gaps

18

in Appendix B instead of a complete listing of both original and new scope, and original and new

gaps. Because the parties did not negotiate to exclude the original scope or original gaps, the use

of "replace" was a mistake.

85. A large part of the original scope included gaps for integrating the Deere service

module. These gaps were not included in the amended appendices as they were part of the original

appendices. Deere had no reason to believe that these gaps were not included in the project

because: (1) integration of the Deere service module is included on the original list of capabilities

contained in Appendix A to the Global Template SOW; (2) during Amendment 1 negotiations, the

parties were conducting a service module integration proof of concept, showing that this part of

the project was alive and well; (3) the DBS would not function in a single country without the

Deere service module; and (4) Deere paid for service module integration gaps in a specific line-

item under the Global Template SOW, and Amendment 1 did not remove that line-item from the

Global Template SOW.

86. Deere signed Amendment 1 believing that its Appendices modified rather than

replaced those in the Global Template SOW.

87. Following execution of Amendment 1, and without explanation, XAPT refused to

develop service module integration stories. Despite Deere continuing to submit service module

integration stories to XAPT for development, XAPT continued to reject them, and, inexplicably,

sought more fees to develop them.

88. Deere discovered the basis of XAPT's refusal to develop service module integration

stories. Although the project included $1.1 million for service module integration stories, XAPT

had taken the position that the "replacement" of Appendix A had removed service module

integration from the project scope.  Since the parties did not negotiate such a removal,  Deere would still have to pay the $1.1 million line-item, but would get nothing in return.

89.     Deere brought the contract mistake to XAPT's attention at a meeting in Budapest on April 23, 2019 between Deere representatives and Dejan Popovic.

90.     At this meeting, Deere informed Popovic that it seemed like he had known all along about the mistake in the Amendment 1 Appendices—that the unintended effect of the contractual language would be to exclude service module integration from the project scope yet still require that Deere pay it.  Deere told Popovic that it seemed that XAPT had stayed quiet knowing the Amendment 1 did not accurately reflect the parties' understanding.

91.     In response, Popovic exclaimed that "of course" he knew Amendment 1 would eliminate service module integration from the contract and that he knew that was not Deere's expectation.  Popovic referenced his prior warning to Deere that there would be consequences to switching to a fixed bid.

92.     To date, XAPT has refused to provide the service module integration work for which Deere has paid nearly all of the $1.1 million.

### J.   XAPT's Fraudulent Misrepresentation To Induce Deere To Choose XAPT

93.     From the inception of the relationship, and consistently over the next almost two years prior to contract execution, including at least nine in-person meetings at Deere's office in East Moline, Deere consistently described to XAPT the DBS that it intended to purchase from an Independent Software Vendor: at its most basic, a global DBS template with more than three hundred enumerated capabilities.

94.     Though Deere's messaging regarding its needs for the project remained consistent, XAPT grossly and consistently misrepresented the configurability of its product and the

development required to adapt its system to meet Deere's capability requirements, both of which directly impact project costs.

95.    Prior to entering into the contract, XAPT and Deere had many meetings and conversations to understand the full extent of work needed to modify XAPT's current system to perform all of Deere's desired capabilities.  Deere and XAPT understood that this was critical information to Deere's selection of an Independent Software Vendor and that it was closely linked with the timing and cost of the project.

96.    During the March 1-3, 2016 deep dive meetings at XAPT's offices in Miami, Florida, prior to XAPT submitting a bid for the project, Deere and XAPT used demonstration scripts to analyze the 300+ capabilities that the new DBS must meet and XAPT, including subject-matter experts Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, Juliet Cheng, Vice President of Business Development Sean Skiver, Chief Operating Officer Ralph Hunt, Chris Wittusen, and Daniel Enekes, represented that the majority of the capabilities required minimal or no configuration.  XAPT represented that there were only fifty gaps that would require coding/development.

97.    Again, on March 31, 2016, at a Proposal Presentation, Ralph Hunt, Chief Operating Officer of XAPT, and Sean Skiver, Vice President of Business Development, reiterated these representations, that, to meet Deere's 300+ list of capabilities, only fifty gaps would require coding/development.

98.    Once again, on July 11-12, 2016, in Budapest, XAPT reiterated its competence and efficiency, and emphasized that it could tailor its solution quickly and efficiently, with minimal development/coding (and only fifty gaps).

99.     Appendix A, Section A to the Global Template SOW contains 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.

100.    In Appendix B, XAPT identifies only fifty "gaps" that would require additional development in order to meet the core capabilities enumerated in Appendix A.

101.    On information and belief, XAPT, a claimed industry leader with extensive experience in the industry creating integrated software systems for "mid-size and enterprise organizations" in the heavy equipment market, was well aware of what was required to modify its current software system, NAXT.

102.    XAPT also knew that quoting fewer gaps meant the estimated contract price would be much lower.

103.    Instead of the promised fifty (50) gaps XAPT identified, it has become clear that the number of gaps required to develop the system is well over six hundred (600)—and this is only to roll the system out in Mexico, Australia, and New Zealand.  For the Global DBS to be available in all seven countries as originally planned, it is impossible to create a dependable estimate of gaps due to XAPT's misrepresentation regarding its product and development abilities.

**K.  Removal of Exclusivity**

104.    By June 2019, Deere understood that it needed to enlist additional development help to complete the project.

105.    Deere asked XAPT to remove the MSA's exclusivity clause so that it could engage another developer to perform some of the work, and XAPT agreed to do so for additional consideration.

**L.  Project Prognosis**

106.    To date, the Global DBS, originally scheduled to be available in seven countries by now, is not available in a single country.

22

107.    The current schedule does not provide for the system to be available to dealers in its first country—Mexico—until June 2020.

108.    The DBS is estimated to be available in its second country, Australia, in October 2020.

109.    As currently contemplated under Amendment 1, XAPT's full performance of its development responsibilities and delivery of all scope would result in a DBS available for dealers in only three countries: Mexico, Australia, and New Zealand.   Users in these three countries comprise only ten percent of the originally planned users.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT

110.    Deere incorporates by reference paragraphs 1–108 as though fully stated herein.

111.    The MSA, Global Template SOW, Governance SOW, and XSDA ("Contracts"), are valid and enforceable.

112.    XAPT has repeatedly breached its obligations under the Contracts.

113.    More than twenty-seven months, and over a hundred meetings in East Moline alone, after the parties entered into the Contracts, XAPT has not developed a system that includes Deere's 393 required capabilities, or that includes functionality in "Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."   Global Template SOW, § 3.1, App'x A.  The Global DBS is not available for purchase by Deere dealers in a single country.

114.    XAPT has multiplied, rather than closed, the gaps required to meet Deere's capability list.  To date, despite 20 monthly code deliveries, there are more than 315 gaps still to close before the DBS can be made available in Mexico, Australia, and New Zealand.

115.    XAPT has failed to meet the metrics established for system performance, including the maximum processing time thresholds for everyday dealer tasks, and has refused to work with Deere to update processing time targets, as provided in Appendix E to the Global Template SOW.

116.    XAPT has neither provided the personnel necessary under the Contracts, nor used Agile product development methodology.

117.    XAPT has not followed the communication and decision lines detailed in the Governance SOW, including by seeking approval for important contract amendments from Deere employees not authorized to make such decisions.

118.    XAPT has consistently failed to meet its monthly obligation to deliver 90% of its committed deliverables.  To date, XAPT has provided the required 90% on only 2 of 20 monthly code deliveries.

119.    XAPT has failed to meet quality targets for its development work and has failed to deliver code meeting industry standards for quality.  XAPT's code is marred with more than 300 currently unresolved defects, and XAPT has failed to meet its published monthly defect resolution targets.

120.    XAPT has also failed to meet its representations and warranties under the Contracts.

121.    Due to extremely high defect rates and XAPT's failure to complete its development obligations, the "Product" and the "Global Template" do not "perform in accordance with the Specifications[.]"  XSDA § 20.1.

122.    By failing to fill important project roles, and failing to attract and retain developers who are sufficiently skilled to provide code without hundreds of significant and costly defects, XAPT has failed to "provide sufficient Representatives to perform the Services within the time

frames agreed and [provide] Representatives [with] sufficient skill, knowledge and training to perform the Services."  MSA § 10.3; accord XSDA § 20.3.

123.    By providing highly defective code, circumventing established communication and decision making channels, and continually seeking to obtain higher payments from Deere for the same obligations for which it originally contracted, XAPT has not provided its services "in conformance with good professional practices and accepted industry standards."  MSA § 10.2; accord XSDA § 20.2.

124.    Despite Deere providing notice as required under the Contracts, including months of communications at the requisite senior management level at Deere and XAPT, XAPT has failed to cure the breaches.  MSA § 10.12.

125.    Deere has paid millions of dollars to XAPT to date, and has otherwise performed its obligations under the Contracts.

126.    Deere has suffered damages as a result of XAPT's breaches in an amount greater than $15,000,000.

## COUNT II – FRAUDULENT INDUCEMENT

127.    Deere incorporates by reference paragraphs 1–108 as though fully stated herein.

128.    As more fully set forth in Sections C and J of the Factual Background, XAPT made false statements and misrepresentations to induce Deere to choose XAPT as its Independent Software Vendor.

129.    Prior to entering into the Contracts, XAPT misrepresented that NAXT could already perform the vast majority of capabilities on Deere's list of required capabilities, either out-of-the-box or with minimal configuration.

130.    XAPT's estimate for the total cost to configure NAXT to Deere's capability list, integrated into the Contracts as Exhibit M, was $3,780,770.

131.    So far, Deere has paid $5,392,503 in configuration costs.

132.    In addition, XAPT misrepresented that there would only be fifty development needs—gaps—to bring NAXT into line with all of Deere's required capabilities.  XAPT's list of gaps to meet Deere's required capability list has been integrated into the Contracts as Exhibit B to the Global Template SOW.

133.    XAPT's estimate for the total cost to close the gaps in Deere's capability list, integrated into the Contracts as Exhibit M, was $727,584.

134.    To bring NAXT to Deere dealers in only three of the originally anticipated and contracted-for countries—Mexico, Australia, and New Zealand—there are still more than three hundred gaps requiring development.

135.    It is impossible to create a dependable estimate of gaps to bring NAXT to Deere dealers in all seven jurisdictions due to XAPT's misrepresentation regarding their product and development abilities.

136.    So far, Deere has paid approximately $3,600,000 in gap closure development costs.

137.    XAPT represented that it could complete the entire development process in approximately eighteen months.

138.    To date, after more than twenty-seven months, the software system is not close to developed, and is not available to a single Deere dealer.

139.    Upon information and belief, at the time XAPT made these false statements and misrepresentations as to the configurability, gaps, cost, and project timeline, it knew they were false and/or made them with reckless indifference to the truth.

140.    On information and belief, XAPT, a "global leading provider of Microsoft Dynamics ERP business solutions," with extensive experience in the industry creating integrated

26

software systems for "mid-size and enterprise organizations" in the heavy equipment market, was fully aware of what was required to modify its current software system to meet the capabilities list, and the time and cost needed to do so.

141.    Instead, XAPT grossly misrepresented the configurability, gaps, and cost in order to induce Deere to enter into lucrative, decade-long development, licensing, and servicing contracts.

142.    XAPT's false statements and misrepresentation induced Deere to choose XAPT to develop its global DBS.

143.    Because XAPT had extensive experience in developing integrated DBS for global implementations and up-scaling, configuring and tailoring its DBS to the needs of its customers, and had extensive knowledge and experience in the heavy equipment industry, Deere's reliance on XAPT's false statements and misrepresentations was reasonable.

144.    As a result of XAPT's misrepresentations, Deere has been injured in an amount exceeding $48,000,000.

## COUNT III – REFORMATION

145.    Deere incorporates by reference paragraphs 1–108 as though fully stated herein.

146.    As more fully set forth in Section I of the Factual Background, the parties' true agreement in Amendment 1 was for its appendices to add additional information to the appendices in the Global Template SOW, for example, to reflect the fact that XAPT had failed to originally identify the correct gaps in order to meet the list of capabilities in Appendix A to the Global Template SOW.

147.    Contrary to the parties' agreement, the text of Amendment 1 provided that its appendices would "replace" those in the Global Template SOW.  Deere executed Amendment 1

believing that its appendices would "amend" rather than replace those in the Global Template SOW.

148.    XAPT knew the language of Amendment 1 did not align with the parties' agreement and Deere's expectation because: (a) XAPT's president, Dejan Popovic, alluded to consequences for fixing the remaining price of the project; (b) XAPT sought approval for Amendment 1 from Deere employees not authorized to make such decisions, in violation of the Governance SOW; and (c) when Deere asked Popovic whether he knew of the mistake, he stated that "of course" he knew.

149.    Deere therefore seeks reformation of Amendment 1 to reflect the parties' agreement that the appendices to Amendment 1 be added to, rather than replaced by, the appendices to the Global Template SOW.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Deere & Company respectfully requests that this Court finds in its favor and against Defendant as follows:

a.    Enter judgment for Plaintiff and against Defendant on Count I;

b.    Award damages in an amount to be determined at trial, in the amount of $15,000,000 under Count I;

c.    Enter judgment for Plaintiff and against Defendant on Count II;

d.    Award damages in an amount to be determined at trial, in excess of $48,000,000 under Count II or, in the alternative, provide relief based on rescission;

e.    Enter Judgment for Plaintiff and against Defendant on Count III;

      f.      Award reformation of Amendment 1 to state that the appendices to Amendment 1 be added to, rather than "replace", the appendices to the Global Template SOW; and

      g.      Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff Deere & Company hereby demands a trial by jury on all issues so triable.


Dated:  October 18, 2019                */s/ Mariangela Seale*

                            Matthew Fischer
                            Mariangela Seale
                            Lauren Jaffe (*application pending*)
                            RILEY SAFER HOLMES & CANCILA LLP
                            70 W. Madison Street, Suite 2900
                            Chicago, Illinois 60602
                            (312) 471-8700 (tel)
                            (312) 471-8701 (fax)
                            mfischer@rshc-law.com
                            mseale@rshc-law.com
                            ljaffe@rshc-law.com

                            *Attorneys for Plaintiff Deere & Company*