E-FILED
Wednesday, 20 May, 2020 10:54:28 AM
Friday, 27 March, 2020 10:04:48 AM
Clerk, U.S. District Court, ILCD

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:19-cv-04210-SLD-JEH |
| | ) | |
| v. | ) | |
| | ) | |
| XAPT CORPORATION; XAPT | ) | |
| SOLUTIONS PTY LTD; | ) | |
| XAPT KFT; COSMO CONSULT | ) | |
| BUSINESS SOLUTIONS S.R.L, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED AND FIRST SUPPLEMENTAL COMPLAINT

Plaintiff Deere & Company ("Deere"), by and through its undersigned attorneys, for its Second Amended and First Supplemental Complaint against Defendant XAPT Corporation ("XAPT"), XAPT Kft ("XAPT Kft"), XAPT Solutions Pty Ltd ("XAPT Solutions"), and Cosmo Consult Business Solutions S.R.L. ("Cosmo Consult") (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.  Deere brings this action for breach of contract, fraudulent inducement arising out of XAPT's bait and switch tactics, reformation of Amendment 1 to the contract, breach of post termination contractual obligations, declaratory judgment, injunctive relief, specific performance, conversion, replevin and alter ego.

2.  To win a lucrative, decades-long development and licensing project with Deere, XAPT grossly misrepresented its system's capabilities and the cost to complete the project. Only after the project began and Deere paid XAPT millions of dollars did it become clear that XAPT is

1

either incapable of or has chosen not to perform at the requisite level, leaving Deere with nothing to show for it.

3. In 2013, Deere decided to develop a state of the art global, integrated software system that its dealers in seven geographical locations around the globe could use to manage all aspects of their businesses, from sales and inventory, to tax and regulatory, to service and parts.

4. Seeking to win the bid, XAPT promoted its depth of industry knowledge and experience, the robust and flexible nature of its software, its ability to easily modify its out-of-the-box template "to suit John Deere," and its expertise in global implementation and scaling up. XAPT represented its software solution, "NAXT," as a kind of software utopia: highly configurable and perfectly tailored to the heavy equipment market. XAPT told Deere that it could meet Deere's requirements with minimal development in eighteen months.

5. These promises, and others, induced Deere to choose XAPT for a multi-phase, lucrative, decade-long contract.

6. Despite XAPT's representations that it is an expert and global leader in software solutions, XAPT continually failed to deliver as required by the contract, and the current code contains exceptionally high numbers of defects. XAPT's poor performance has caused the project to take years longer, and millions of dollars more, than Deere had committed.

7. In addition, XAPT's underhanded negotiation tactics resulted in a contractual amendment that the parties did not intend.

8. The software XAPT promised and for which Deere contracted was never completed and is not available to a single Deere dealer.

9. Following XAPT's mounting breaches, Deere terminated its contracts with XAPT and asked XAPT to comply with its post termination obligations—which it has yet to do.

10. Deere also asked XAPT to comply with its contractual obligations and return Deere's confidential information, which to date, XAPT has also failed to do.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12. Venue is proper in the Central District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims occurred in the Central District of Illinois and the damages arise here.

13. Pursuant to Local Rule 40.1(F), the basis for filing in the Rock Island Division is that the plaintiff resides in Rock Island County, Illinois, and a substantial portion of the events or omissions giving rise to the claims occurred in Rock Island County, Illinois.

## THE PARTIES

14. Plaintiff Deere & Company is a Delaware Corporation with its principal place of business in Moline, Illinois. Deere is engaged, among other things, in the business of delivering products and services to support those linked to the land, in line with its core values of integrity, quality, commitment, and innovation.

15. Defendant XAPT Corporation (XAPT) is a Florida Corporation with its principal place of business in Miami, Florida. XAPT is a division of the New Frontier Group, a "fast-growing regional IT solutions player" headquartered in Vienna, Austria. XAPT styles itself a "global leading provider of Microsoft Dynamics ERP business solutions" that "provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

16. Defendant XAPT Kft ("XAPT Kft") is a foreign company with its principal place of business in Budapest, Hungary, and none of its owners are citizens of Illinois.

17. Defendant XAPT Solutions Pty Ltd (XAPT Solutions) is a foreign company with its principal place of business in Brisbane, Australia, and none of its owners are citizens of Illinois.

18. Defendant Cosmo Consult Business Solutions S.R.L. (Cosmo Consult) is a foreign company with its principal place of business in Bucharest, Romania, and none of its owners are citizens of Illinois.

## **FACTUAL BACKGROUND**

### A. **Deere Develops Strategy to Offer Dealers Single, Integrated, Global Dealer Business System**

19. Deere dealers run businesses involved in selling, renting, and servicing agriculture, turf, construction, and/or forestry equipment. Deere dealers operate on six continents.

20. Behind the scenes of a Deere dealer's business sit dozens of other functions, including marketing, accounting, tax, administrative, regulatory, human resources, information technology, inventory, data management, contract management, and subscription management, among many others. Many of these functions are enabled by separate web applications.

21. To bring multiple applications together such that information can flow among them (for example, linking inventory to parts purchases, or sales information to financial statements), dealers purchase a computer software system known as a "Dealer Business System," or "DBS."

22. Deere has developed and offered its own DBS, which has been available in the United States, Canada, Mexico and Brazil.

23. After extensive analysis and discussions with stakeholders and consultants, Deere determined in 2013 that it could better serve its dealers by developing a single, fully integrated DBS for purchase by all of its dealers in key markets.

24.     Deere's vision, informed by its own DBS experience, was to offer its dealers a fully integrated DBS that could be configured by market.  For example, an agriculture equipment Deere dealer in Mexico could select options applicable to that dealer, such as the Spanish language, agriculture equipment settings, and a Mexico regulatory function.  A Brazilian construction and forestry dealer could, by contrast, select Portuguese, construction and forestry, and Brazilian regulatory settings.  Technological advances had rendered Deere's own DBS difficult to expand, so Deere decided to start anew using updated technology.

25.     First, Deere developed a list of more than three hundred capabilities that the new DBS must have.  These capabilities fell into five functional areas: accounting, parts, rental, sales, and service.  The capabilities are currently offered by Deere's own DBS and span the operations of Deere dealers.  They include, for example, "Associate a file with an accounting ledger, account, PO [Purchase Order] or other," "Quickly and easily view available payment options for the customer prior to finalizing the invoice. Credit limits and restrictions should be easy to determine whether it is in house (accounts receivable) or outside financing (JDF)," and "Quickly and easily request, schedule and execute transportation events with two work orders to two different customers on two different machines on same transportation route."

26.     Next, Deere targeted seven markets: first Mexico followed by Australia and New Zealand, and then Canada, the United States and its territories and possessions, Brazil, and Argentina.

27.     Finally, Deere determined that it needed a platform on which the system would be built, and a developer to create and implement the system, as well as provide ongoing support.

**B. Selecting a Platform and a System Developer**

28.     Because of the importance of the project and the longevity of the planned relationship, Deere took great care in selecting its platform provider and system developer for the global DBS.

29.     Deere began by sending a Request for Information ("RFI") to several potential platform providers on September 27, 2013.  Finalists in the RFI process were invited to demonstrate their platform capabilities.  After months of analysis and rigorous testing, including deep dive meetings to gauge capabilities, proof of concept projects to understand user experience, and discussions with stakeholders, Deere selected Microsoft as the provider of the platform on which the DBS would be built.

30.     To find its system developer—its "Independent Software Vendor"—Deere sent a Request for Proposal ("RFP") to potential providers on December 4, 2015.  As it did with selecting its platform provider, Deere rigorously analyzed and vetted its Independent Software Vendor prospects.  This process, which began in 2014 and ended with the execution of contracts with XAPT on June 26, 2017, had many facets, including multiple deep dive meetings, proof of concept projects, financial modeling, contract negotiations, and discussions with dealers and stakeholders.

**C. XAPT and Deere's Extensive Pre-Contract Meetings and Discussions**

31.     Deere and XAPT's relationship began with a telephone call in December 2015. From the inception of the relationship, and consistently over the next almost two years prior to contract execution, Deere consistently described its development needs: a global DBS template, customizable by region, including more than three hundred enumerated capabilities, data migration from Deere's prior systems, full integration among its applications, and initial roll-out to dealers in seven countries.

6

32.     During the selection process, including at least nine meetings at Deere's office in East Moline, Illinois involving more than twenty XAPT representatives, XAPT grossly and consistently misrepresented the development required to adapt its allegedly "proprietary and confidential" NAXT system to meet Deere's capability requirements, the time it would require to complete the project, and its cost.

### 1.    March 1 – March 3, 2016 Deep Dive Meetings

33.     During deep dive meetings during the week of February 29, 2016 at XAPT's offices in Miami, Florida, Deere and XAPT and its representatives used demonstration scripts to analyze the 300+ capabilities that the new DBS must have in comparison with the preconfigured, out-of-the-box capabilities of XAPT's NAXT software.

34.     A primary goal of the deep dive meetings was to determine the number of gaps in each subject matter area that would require coding to meet Deere's needs.  The heart of the meetings involved presentations by XAPT subject-matter experts, including Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, and Juliet Cheng.  Also present from XAPT were team leaders and salesmen, including COO Hunt, who oversaw the NAXT team, VP Skiver, Chris Wittusen, and Daniel Enekes.

35.     Each XAPT subject matter expert spent hours presenting to Deere on NAXT's functionalities.  Through each of these presentations, as well as the entire deep dive process, XAPT's message was the same: NAXT could already perform the vast majority of capabilities on Deere's list, either out-of-the-box or with minimal configuration.  XAPT represented that there were only 50 gaps that would require coding/development.

36.     "Gaps" are desired services and/or functions that XAPT's system could not perform that would require development/coding.  Such development/coding is done utilizing "stories."  The

number of stories needed to close a single gap varies, but closing 50 gaps generally requires more than 50 stories.

### 2. March 17, 2016 RFP Response

37.     On March 17, 2016, XAPT submitted its response to Deere's RFP. XAPT's response contained several related documents, including an ERP Project Proposal, a draft Statement of Work, Draft Project Plans, and responses to dozens of questions Deere used to vet proposals. In a "Certification and Authority Statement" signed by COO Hunt and Frank Squeri, XAPT's Chief Finance Officer on the same date, XAPT agreed to be bound by the representations, terms and conditions contained in its Proposal.

38.     In XAPT's ERP Project Proposal dated March 17, 2016, it represented:

a.  "We understand the size of this undertaking, we have developed implementation schedules for the template buildout and for each dealer size that are conservative in nature and allow for extensive time to undertake testing, training, and data migration."

b.  "Create the Template – XAPT can undertake this activity with existing staff."

c.  "XAPT Corporation is a global leading provider of Microsoft Dynamics ERP business solutions. XAPT specializes in the development of industry specific solutions built on the Microsoft Dynamics AX ERP platform for the Heavy Equipment Distribution, Automotive and Wholesale/Distribution industries and provides a full complement of business consulting services, including implementation and integration, for mid-size and enterprise organizations globally."

39.     In response to a Deere RFP questionnaire, XAPT stated that it "does not intend to subcontract any services - other than for the provision of data center services through Microsoft

Azure, or as a method of engaging staff in locations where XAPT does not, or is not able to set up a local company and thus decides to use a service provider. In such circumstances XAPT will consult with John Deere."

### 3. March 31, 2016 Proposal Presentation

40.      Ralph Hunt, COO of XAPT, and VP Sean Skiver of Business Development, reiterated these representations during a March 31, 2016 proposal presentation to Deere in Moline. During this presentation, XAPT touted its industry knowledge, development qualifications, product, and commitment to Deere. In short, XAPT presented itself as the ideal developer for Deere.

41.      XAPT emphasized its "extensive industry knowledge and experience," its "[h]istory of working with Equipment Manufacturers," and its "[e]xperience in implementing [its] solution globally." XAPT represented that it focuses both "on the development and implementation of integrated software solutions tailored to the Heavy Equipment Industry," and that it understood the "added complexity of implementing systems in multiple countries, cultures and languages."

42.      For its product, XAPT touted the "functionally rich, highly flexible" nature of its software, the process of "[u]sing an existing template and methodology as a base to build on," and its ability to modify its existing template "to suit John Deere." XAPT characterized its product and development capabilities in a manner that demonstrated its understanding of and commitment to meeting Deere's needs:

  -   "One database. One environment. Fully integrated. No redundancy. From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."

  -   "The fully integrated solution for John Deere dealers."

- "XAPT offers a fully integrated solution that provides functionality across the entire dealership. From CRM to field service, rental, equipment sales, parts, and a full suite of financials, the system incorporates functionality that meets the needs of all areas of the dealership."

- "The complex structures of equipment dealerships, their suppliers and customers, demand both global and local knowledge. We bring the reassurance of a fully integrated solution, tailored to equipment dealers, with an understanding of regional requirements, delivered by Award winning specialists. XAPT provides clients full visibility and control across every branch and subsidiary, wherever their location."

43. Consistent with Deere's core value of commitment, XAPT promised to "be involved forever – not just the term of the project."

### 4. Proof of Concept Presentations July 11-12, 2016

44. At its Proof of Concept presentations to Deere on July 11-12, 2016, in Budapest, Hungary, XAPT reiterated these themes: competence, responsiveness to Deere's needs, and ability to tailor its solution quickly and efficiently, with minimal development/coding.

45. For example, XAPT demonstrated how it would tailor its system to handle an everyday dealer task: a customer orders an item in-store and pays for it at the cash register. While the XAPT system originally took eleven minutes and dozens of "clicks" of the computer mouse to complete this task, XAPT quickly streamlined the process to take a fraction of the "clicks" and less than six minutes. XAPT represented that its system was flexible enough to handle many such tasks in the same manner.

46. Following all the meetings and a thorough review of XAPT's RFP response, Deere engaged XAPT as its Independent Software Vendor. XAPT's first task as Independent Software Vendor was to develop the Global DBS template.

### D. Contractual Framework for Creating the Global DBS

47. Four principal contracts govern the creation and development of the Global DBS: (a) the Master Services Agreement dated June 26, 2017, as amended on June 27, 2018 and June

10

26, 2019 (the "MSA"); (b) the Work Order Template – Global Template dated June 26, 2017 (the "Global Statement of Work" or "Global Template SOW"), as amended on February 11, 2019 ("Amendment 1"); (c) the Work Order – Governance, dated June 26, 2017 (the "Governance Statement of Work" or "Governance SOW"); and (d) the XAPT Subscription Delivery Agreement ("SDA"). The MSA, Global Template SOW, Governance SOW, and SDA are collectively referred to as the "Contracts".

48.     The MSA establishes the framework for the parties' relationship, and the Global Template SOW and the Governance SOW operate within this framework. The Global Template SOW governs the technical aspects of developing the Global DBS. The Governance SOW establishes structures for communication, project management, and quality control. The SDA structures subscription-related services, and also contains warranties related to the product itself.

1. **Master Services Agreement**

49.     Section 3.6 governs XAPT's use of subcontractors. Under Section 3.6, XAPT:

> [M]ay subcontract any of the Services to those subcontractors and Affiliates listed on the applicable SOW, or, thereafter, with Deere's prior written consent to use the subcontractor in the capacity described in [XAPT]'s consent request (such consent not to be unreasonably withheld). . . . [XAPT] will not disclose Deere Data or Confidential Information to a subcontractor unless and until the subcontractor needs to have access to the information to perform the Services relating to the Master Agreement and has agreed in writing to confidentiality terms substantially equivalent to that required of [XAPT] under this Agreement. . . . Prior to disclosing any Confidential Information of Deere to such approved subcontractors, [XAPT] will require each approved subcontractor to execute a non-disclosure agreement in the form provided by Deere.

> MSA § 3.6.

50.     Section 6.5.1 lays out some of Deere's ownership and intellectual property rights:

> Deere shall own all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications. Supplier hereby irrevocably assigns in perpetuity to Deere, and will require its

11

Representatives to assign to Deere, all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications. As to any Deliverables (other than Supplier Modifications) and Deere Modifications created after execution of this Agreement, the assignment shall become effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

MSA § 6.5.1.

51. The MSA broadly defines "Deliverable" or "Deliverables:"

[T]hose Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

MSA § 1.12.

52. In addition, under Section 6.3.4, Deere owns all "interfaces" between Deere's Pre-Existing Works and XAPT's Pre-Existing Works, Combined Solution, or Modifications created by XAPT:

Supplier agrees that notwithstanding anything to the contrary set forth in this Agreement or any SOW, all application program interfaces (APIs) and other interfaces between Deere Pre-Existing Works to Supplier Pre-Existing Works, to Combined Solution and/or to Modifications created by Supplier ("Interfaces") shall be owned exclusively by Deere and shall be deemed Deere Modifications.

MSA § 6.3.4.

53. In addition to Deere's ownership rights, the MSA defines several categories of Deere Confidential Information which include the MSA itself, as well as "any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data,

and all Deliverables, with the exception of Deliverables deemed "Supplier Modifications." MSA § 6.13.2.

54.     Under Sections 10.2 and 10.3, XAPT represents and warrants "that all Services will comply with the requirements in each applicable SOW in conformance with good professional practices and accepted industry standards," and "that it will provide sufficient Representatives to perform the Services within the time frames agreed and that its Representatives have sufficient skill, knowledge and training to perform the Services." MSA §§ 10.2, 10.3.

55.     Section 12 of the MSA governs termination. Upon termination of the MSA, under Section 12.4.2, XAPT "must deliver to Deere all Deliverables, whether finished or unfinished, developed prior to termination, in a form and format useable by Deere (and Deere agrees to pay for such material according to the relevant SOW)." MSA § 12.4.2.

56.     Under Section 12.4.1, each Party must "[p]romptly return (or at Discloser's option, destroy) all applicable Discloser Confidential Information and other property and materials of Discloser, except that Deere shall not have the obligation to return any Supplier Modifications and Supplier Pre-Existing Works for which irrevocable perpetual licenses have been granted" under the MSA. MSA § 12.4.1.

## 2.  Global Template SOW

57.     The Global Template SOW "sets forth the Services to be performed by [the Parties] related to the NAXT 365 Solution." It "represents the complete baseline for scope, Services, Deliverables, and acceptance applicable to this project." Global Template SOW § 2.2.

58.     Based on XAPT's estimates, the Project "indicates a roughly 18 month duration." Global Template SOW § 3.3.

59.     The Global Template SOW sets forth XAPT's understanding of the project, including that it "has been retained to develop a Global Template for the implementation of a Dealer Management System for Authorized Dealers globally."   Global Template SOW § 2.3.

60.     Section 3.2.2 requires XAPT to provide dedicated personnel in the following areas: Project & Executive Sponsor, Project Management, Solution Architecture, Functional Consultants, Technical Consultants, Data Migration Consultants, and Technical Writers, each with enumerated responsibilities.  Global Template SOW § 3.2.2.

61.     Under Section 4.1, XAPT "will provide all Deliverables and complete milestones by the respective target dates identified below."  Global Template SOW § 4.1.  These targets included a "go-live (acceptance of template)" date in all seven countries of April 12, 2019.  Global Template SOW App'x I.

62.     The Global Template SOW provides for XAPT to invoice based on time and materials, and XAPT estimated that the cost of the Global Template SOW would be $7,744,679.  Global Template SOW § 6.1.

63.     As described in Section 2.1 of the Global Template SOW, the Appendices crystallize the scope of the project as well as its planned methodology and cost.

64.     Appendix A, Section A contained 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.  These capabilities include "functionality for each of the following areas (including but not limited to): Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."   Global Template SOW § 3.1.

65.     Appendix B listed the 50 gaps XAPT identified would require additional development in order to meet the core capabilities enumerated in Appendix A.  According to

14

Appendix B, "Most of these forms, data and functionalities are available as standard in Dynamics 365[.]"

66.   Appendix C detailed 137 required integrations to Deere applications.

67.   Appendix E contains Service Level Agreements ("SLAs") and was created "to allow Deere to ensure that user experience and expectations are met as they pertain to speed and response times of the solution."   The SLAs "will be used to measure the quality, delivery, and overall performance of [XAPT] for customizations" and are "designed to achieve the following goals:

1.   On-time delivery of quality code that meets or exceeds requirements

2.   Appropriate amount of testing

3.   Timely response to identified problems

4.   Severity 1 [critical] and 2 [major] defects associated with supported Authorized Dealer processes will be fixed by [XAPT] prior to production release of the Authorized Dealer as defined by the acceptance criteria below."

68.   Under Appendix E, unless otherwise specified in an individual Work Order:

- The "Plan/Deliver Score target is 90%."   The Plan/Deliver Score is "the number of system changes delivered divided by the total number of mutually agreed upon system changes in original FDD on or before the defined milestone."

- The "Acceptance Testing Coverage target is 90%."   Acceptance Testing Coverage is "the number of acceptance tests executed divided by the total number of acceptance tests associated with the system changes in the original FDD delivered on or before the defined milestone."

- The "Quality Bar target," or "number of identified open defects associated with the customization as defined in the approved FDD delivered on, or before the defined milestone," is:

    i.   "No known Severity 1 [critical] defects

    ii.   No Severity 2 [major] defects without mutually agreed workaround and resolution plan for each related defect.

       iii.  Mutually agreed resolution plans for all Severity 3 [standard] and Severity 4 [minor] defects."

69.     Appendix E also provides an "established set of metrics designed for measuring the performance and User Experience for mutually agreed [dealer] business processes"—in other words, maximum processing time thresholds for everyday dealer tasks, such as "Retrieve a previously created parts order file." The established set of metrics is based on the processing times in Deere's current DBS.

70.     Appendix J "Supplier's Development Methodologies," states, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices." In particular, XAPT's "development methodology is based on sprints of two weeks, continuous integration, daily builds, with unit and functional testing as part of the daily operation." XAPT submits "every development . . . to a best practice validation using a Microsoft provided tool."

71.     The Agile method of software development is a highly collaborative, iterative approach to product development. It involves setting a list of prioritized requirements and completing the top priorities first. Work is completed in two-week sprints. After each sprint, the list of priorities is re-evaluated, and priorities often shift as the project progresses. Deere, as the customer for whom XAPT is developing a product, drives priority setting.

72.     Appendix M provides a total cost estimate for the project, as follows:

    a.  $13,604,800 under the Governance SOW

    b.  The following under the Build Global Template SOW

        i.  $3,780,770 for Template Build Configuration

       ii.  $727,584 for Template Build – Gaps

     iii.  $1,100,000 for Template Build – SD [Service Delivery]

iv. $1,986,325 for Template Build – JD Apps Integration (rest); and

v. $150,000 for Mexico Localization Development

3. **Governance SOW**

73. The Governance SOW, effective for ten years, "defines the roles and responsibilities of both Parties, and establishes reporting mechanisms that are required to maintain an effective working relationship[.]" Governance SOW §§ 2, 7.1.

74. Sections 2.4 and 6.2, and Appendix B address the composition of XAPT's team, which included the following positions: Project Director, Project Manager, Project Scheduler, Quality Assurance (QA) Manager, Technical writers, Consultants, and Developers, etc. Governance SOW § 2.4. The Project Director and Project Scheduler, as well as a Solutions Architect and Hungary Development Project Manager, are "Key Employees" under the Governance SOW. Governance SOW App'x B. The team also includes infrastructure and cloud support. Governance SOW § 6.2.

75. Appendix I "Supplier's Development Methodologies" reaffirms, among other things, that XAPT's "Product Development team delivers the software solution based on Agile product development practices."

4. **SDA**

76. XAPT makes the following representations and warranties under the SDA:

- "the Product, Global Template and Subscription Services shall perform in accordance with the Specifications" SDA § 20.1;

- "all Services shall be performed in conformance with good professional practices and accepted industry standards" SDA § 20.2; and

- XAPT "will provide sufficient Representatives to perform the Services and its obligation hereunder within the time frames agreed and that its Representatives have sufficient skill, knowledge, experience, competence, skill and training to perform the services and obligations as set forth in this Agreement." SDA § 20.3.

### E. After Contract Execution, Gaps Multiply Exponentially and XAPT Fails to Deliver Project Deliverables, Produces Code Riddled with Errors, and Racks up Costs

77. Once the project kicked off, it became apparent that XAPT grossly misrepresented the number of gaps required to bring its system in line with Deere's list of capabilities. XAPT originally identified just *50 gaps* to produce the global DBS for all seven countries, but that number became well *over 600 gaps* just to produce the Global DBS for Mexico, Australia, and New Zealand.

78. Because XAPT purports to be an industry leader, with experience making similar integrated systems for dealers in the same industry as Deere, this cannot be a harmless miscalculation.

79. During the months following contract execution, including over 100 meetings in which XAPT representatives traveled to Deere's office in East Moline, XAPT's gross misrepresentation of the gaps became apparent, and, at the same time, XAPT failed to meet its code delivery requirements. Among the XAPT representatives who traveled to Deere's office located in East Moline, Illinois were individuals who worked for XAPT Kft.

80. XAPT's code development tasks are divided into component parts and placed into a deliverable timeline. Each task component is a "story." A typical story is assigned a point value between three and 21, depending on the complexity of the development required to complete it. The entire development project was estimated at 4,500 story points, to be delivered in increments of approximately 450 per month.

81. Although development tasks were not classified as stories with point values until later in the project, a conversion of early deliverables into this classification nomenclature is as follows: by February 2018, XAPT was supposed to have delivered 450 points; instead it only

delivered 61. By March 2018, XAPT was supposed to have delivered 900 points, but it had only delivered 159. By April 2018, XAPT was 962 points behind schedule.

82.     Even more problematic than failing to deliver on time, the code is riddled with defects (also known as "bugs") – errors in the code that prevent it from working properly.

83.     By April 2018, XAPT had delivered 388 points, 50 of which met the Defect Service Level Requirements of Appendix E to the Global Template SOW and Appendix D to the Governance SOW.

84.     The cost associated with these deliveries was also significantly higher than expected. On average, each point as of April 2018 had cost $1,235, as compared to XAPT's estimate of $880 (as represented in Appendix M of the Global Template SOW), indicating that XAPT's development took considerably longer than represented. Given that Deere paid based on time and materials, this level of performance cost Deere significantly more than originally agreed.

### F.     Deere Invests in Training XAPT

85.     By April 2018, it became clear that XAPT was not adhering to the Agile project methodology required by the Global Template SOW and the Governance SOW.

86.     Two key features of Agile project management methodology are its priority list and its flexibility. Priorities are re-adjusted at the close of every two-week sprint. Deere, as the customer buying the product, drives priority-setting.

87.     Contrary to the Agile model, XAPT was resisting priority-shifting, and was providing Deere with stories that were not the highest priority.

88.     Deere sent its Manager of Development, Delivery, and Quality for the system to Hungary from April 16-25, 2018 to train XAPT's developers on Agile project methodology in an effort to support XAPT's commitment to use the Agile project methodology.

### G. Post-Training, Gaps Increase, Quality Does Not Improve, and XAPT Seeks a $10 Million Increase in Contract Price to Deliver the Same Product

89.     By June 2018, the identified number of gaps requiring development had risen eight-fold, XAPT continued to deliver behind schedule, and its defect rate remained high.

90.     At this time, gaps had increased to a conservative estimate of more than 400, XAPT was 1,095 points behind schedule, and, of the gaps it did deliver, 56 of 77 contained defects.

91.     At the same time, XAPT requested an additional $10 million to account for the increase in identified gaps due to its own gross misrepresentations, despite the same project scope—the capabilities in Appendix A to the Global Template SOW.

92.     After XAPT sought to exponentially increase the costs of the development project, the parties commenced six months of contentious negotiations to fix the price of the remaining work.

### H. Amendment 1 Creates Fixed Price for Remainder of Development Project and Ties Payment to Quality

93.     The key features of Amendment 1 to the Global Template SOW were: (i) a fixed price for the remainder of the development project, (ii) a fixed number of 545 gaps XAPT would have to close, and (iii) payment tied to meeting quality and delivery performance metrics. Amendment 1 also added 49 gaps of new scope (included as part of the 545), for which Deere agreed to pay $1.179 million.

94.     Despite XAPT's purported expertise, the parties had identified hundreds of additional gaps that XAPT had failed to initially identify, all of which were needed to achieve the original product capabilities. However, in the interest of moving the project forward, Deere agreed in Amendment 1 to limit the number of gaps to 545, plus the service module gaps for the defined service capabilities for which the stories were being created during the negotiations of Amendment

1. In fact, Deere was paying XAPT for functional consulting to define service module gap requirements at that time.

95. To incentivize better performance by XAPT, the parties tied payment to quality: delivering 90% of the code for that month triggered a payment; eliminating Severity 1 and Severity 2 bugs triggered an additional payment; eliminating Severity 3 bugs triggered an additional payment; and completion of certain milestones triggered payment of a risk premium.

## I. The Executed Version of Amendment 1 Does Not Reflect the Parties' True Agreement

96. In Amendment 1, Deere and XAPT re-negotiated only part of their relationship: the number of gaps, quality incentives, fixed prices for gap closing, and $1.179 million in additional project scope. These negotiations were necessitated by XAPT's gross misrepresentation of the number of gaps that it would need to close in order to provide a system with the capabilities required in Appendix A. Deere, relying on XAPT's original estimate of 50 gaps, had not budgeted for the time and materials necessary to close the number of actual gaps, nor had Deere budgeted for the increased per-point cost of development work that was grossly above the estimates provided by XAPT. Deere and XAPT did not renegotiate other key aspects of the relationship, such as the capabilities required to bring the final DBS to market, or the $1.1 million allocated to integrating the Deere service module.

97. The text of Amendment 1 states, under "Amendment to Appendices," that the appendices in the Global Template SOW are "replaced" with the Amendment 1 appendices.

98. Appendix A to the Global Template SOW comprised a list of "capabilities" needed for a complete DBS. Appendix B to the Global Template SOW had the list of "gaps" in order to meet the capabilities list of Appendix A.

99.     By contrast, Appendix A of Amendment 1 included only a list of "gaps," and omitted the list of capabilities, and Appendix B of Amendment 1 included another list of "gaps."

100.     Without a complete list of capabilities in Appendix A, which is filled by "gaps," Amendment 1 fails to capture the fundamental scope and purpose of the DBS project.

101.     Because the parties did not negotiate to exclude the original scope of the project, the use of "replace" in Amendment 1 was a mistake.

102.     A large part of the original scope included integrating the Deere service module. These capabilities were not included in the amended appendices as they were part of the original appendices. Deere had no reason to believe that these capabilities were not included in the project because: (1) integration of the Deere service module is included on the original list of capabilities contained in Appendix A to the Global Template SOW; (2) during Amendment 1 negotiations, the parties were conducting a service module integration proof of concept, showing that this part of the project was alive and well; (3) the DBS would not function in a single country without the Deere service module; and (4) Deere paid for service module integration in a specific line-item under the Global Template SOW, and Amendment 1 did not remove that line-item from the Global Template SOW.

103.     Deere signed Amendment 1 believing that its Appendices _modified_ rather than replaced those in the Global Template SOW.

104.     Following execution of Amendment 1, and without explanation, XAPT refused to develop service module integration stories. Despite Deere continuing to submit service module integration stories to XAPT for development, XAPT continued to reject them, and, inexplicably, sought more fees to develop them.

105. Ultimately, Deere discovered the basis of XAPT's refusal to develop service module integration stories. Although the project included $1.1 million for service module integration stories, XAPT had taken the position that the "replacement" of Appendix A had removed service module integration from the project scope. Since the parties did not negotiate such a removal, Deere would still have to pay the $1.1 million line-item but would get nothing in return.

106. Deere brought the contract mistake to XAPT's attention at a meeting in Budapest on April 23, 2019 between Deere representatives and Popovic.

107. At this meeting, Deere informed Popovic that it seemed like he had known all along about the mistake in the Amendment 1 Appendices—that the unintended effect of the contractual language would be to exclude service module integration from the project scope yet still require that Deere pay it. Deere told Popovic that it seemed that XAPT had stayed quiet knowing the Amendment 1 did not accurately reflect the parties' understanding.

108. In response, Popovic exclaimed that "of course" he knew Amendment 1 would eliminate service module integration from the contract and that he knew that was not Deere's expectation.

109. XAPT refused to provide the service module integration work for which Deere paid nearly all of the $1.1 million.

### J. XAPT's Fraudulent Misrepresentation to Induce Deere to Choose XAPT

110. From the inception of the relationship, and consistently over the next almost two years prior to contract execution, including at least nine in-person meetings at Deere's office in East Moline, Deere consistently described to XAPT the DBS that it intended to purchase from an

23

Independent Software Vendor: at its most basic, a global DBS template with more than three hundred enumerated capabilities.

111.    Though Deere's messaging regarding its needs for the project remained consistent, XAPT grossly and consistently misrepresented the configurability of its product and the development required to adapt its system to meet Deere's capability requirements, both of which directly impact project costs.

112.    Prior to entering into the Contracts, XAPT and Deere had numerous meetings and conversations in order to understand the full extent of work needed to modify XAPT's current system to perform all of Deere's desired capabilities.  Deere and XAPT understood that this was critical information to Deere's selection of an Independent Software Vendor and that it was closely linked with the timing and cost of the project.

113.    During the March 1-3, 2016 deep dive meetings at XAPT's offices in Miami, Florida, prior to XAPT submitting a bid for the project, Deere and XAPT used demonstration scripts to analyze the 300+ capabilities that the new DBS must meet and XAPT, including subject-matter experts Ishtvan Herenyi, Evalina Andrei, Tamas Azbe, Ken Chaser, Juliet Cheng, VP Skiver, COO Hunt, Chris Wittusen, and Daniel Enekes, represented that the majority of the capabilities required minimal or no configuration.  XAPT represented that there were only 50 gaps that would require coding/development.

114.    Again, on March 31, 2016, at a Proposal Presentation, XAPT COO Hunt, and XAPT VP Skiver, reiterated these representations, that, to meet Deere's 300+ list of capabilities, only 50 gaps would require coding/development.

115. Once again, on July 11-12, 2016, in Budapest, XAPT reiterated its competence and efficiency, and emphasized that it could tailor its solution quickly and efficiently, with minimal development/coding (and only 50 gaps).

116. Appendix A, Section A to the Global Template SOW contains 393 enumerated capabilities that form the core functionality required for the Deere Combined Solution.

117. In Appendix B, XAPT identifies only 50 "gaps" that would require additional development in order to meet the core capabilities enumerated in Appendix A.

118. On information and belief, XAPT, a self-professed industry leader with extensive experience in the industry creating integrated software systems for "mid-size and enterprise organizations" in the heavy equipment market, was well aware of what was required to modify its current software system, NAXT.

119. XAPT also knew that quoting fewer gaps meant the estimated contract price would be much lower.

120. Instead of the promised 50 gaps XAPT identified, it had become clear that the number of gaps required to develop the system is well over 600—and this is only to roll the system out in Mexico, Australia, and New Zealand. For the Global DBS to be available in all seven countries as originally planned, it became impossible to create a dependable estimate of gaps due to XAPT's misrepresentation regarding its product and development abilities.

**K.** **Removal of Exclusivity**

121. By June 2019, Deere understood that it needed to enlist additional development help to complete the project.

122. Deere asked XAPT to remove the MSA's exclusivity clause so that it could engage another developer to perform some of the work, and XAPT agreed to do so for additional consideration.

## L.   XAPT Uses Unapproved Subcontractors and Hides It From Deere

123.   In or about October or early November 2019, Deere learned that XAPT was utilizing an unapproved subcontractor on its project that operated under the email address @cosmoconsult.com.

124.   On November 1, 2019, Deere notified XAPT of this breach under Section 3.6 of the MSA and advised that depending on the relationship between XAPT and Cosmo Consult, there may also be breaches of the change in control provisions under Section 15.1 of the MSA.

125.   At that time, Deere asked XAPT to identify the relationship between Cosmo Consult and XAPT with supporting documentation.

126.   On November 1, 2019, XAPT responded by stating: "[Cosmo Consult] is the same consultants as it [*sic*] was approved on July 24th, 2018, the company is also still called XAPT Kft. However, the ownership has changed but no new resources have been added and the resources assigned is [*sic*] the same that Deere approved in July of 2018."

127.   Noting XAPT's failure to provide adequate information to determine the relationship between Cosmo Consult, XAPT Solutions, and XAPT Kft, Deere reiterated is request on November 4, 2019 and asked XAPT to:

•   Please explain your use of resources from this company (Cosmo Consult).

•   Please also explain why you did not notify Deere of the use of this subcontractor (Cosmo Consult).

•   Please identify the relationship between Cosmo Consult and XAPT Corporation with supporting documentation.

128.   Changing its story, on November 5, 2019, XAPT responded that: "Our approved subcontractor "S.C. XAPT Solutions SRL" changed its name to "COSMO CONSULT BUSINESS

SOLUTION S.R.L.". This change has no impact on our contractual relationship with them. Please find attached documentation confirming that it is the same legal entity."

129.  XAPT continued to use Cosmo Consult on Deere's project without authorization.

130.  With no action taken by XAPT to cease Cosmo Consult's access to Deere's confidential information, on or about November 26, 2019, Deere again asked XAPT to comply with its obligations and Deere removed access to all @cosmoconsult.com email addresses.

131.  Nonetheless, despite Deere removing access to all @cosmoconsult.com email addresses, XAPT still continued to share Deere's confidential information with Cosmo Consult team members.

132.  On January 22, 2020, counsel for Deere informed XAPT that it was aware of the blatant disregard of Deere's instruction and that XAPT continued to provide Cosmo Consult access to Deere's confidential information.

**M.    Press Release Tells a Different Story about XAPT and Cosmo Consult's Relationship**

133.  Contrary to XAPT's representations that S.C. XAPT Solutions SRL merely changed its name, a press release dated September 17, 2019 and posted on Cosmo Consult's website at https://www.cosmoconsult.com/news/2019/acquisition-xapt-solutions/ has a headline that reads "COSMO CONSULT ACQUIRES XAPT SOLUTIONS."  A copy is attached hereto as Exhibit 1.

134.  The text of the press release states: "The COSMO CONSULT Group, an internationally active provider of digital transformation services and end-to-end business solutions based on Microsoft Dynamics, has acquired XAPT Solutions, the leading Microsoft ERP- and CRM-partner in Hungary and Romania."

### N.     **Deere Terminates the Project for Cause**

135.     By January 2020, the Global DBS, originally scheduled to be available in seven countries by April 12, 2019, was not available in a single country.

136.     As of October 2019, the schedule was that the system would not be available to dealers in its first country—Mexico—until June 2020, or the second country-Australia-until October 2020.

137.     Deere has complied with the Contracts and fully complied with the Mutual Dispute Resolution process.

138.     Faced with XAPT's breaches accumulating without cure, and a continually expanding timeline, on January 24, 2020, Deere properly terminated the Contracts for cause.

139.     The relevant provisions of the MSA regarding Deere Ownership, irrevocable license, and post termination obligations survive termination, including the provisions governing return of Confidential Deere Information.

### O.     **XAPT Fails to Comply with Its Post-Termination Obligations**

140.     After Deere terminated the Contracts, on January 24, 2020, it asked XAPT to comply with all of its post termination obligations. XAPT has failed to do so.

141.     Again, on March 23, 2020, Deere asked XAPT to comply with its contractual obligations and return Deere's confidential information. XAPT has not.

142.     To date, XAPT has not returned ***any*** documents or materials to Deere.

143.     Section 12 of the MSA outlines the parties' obligations upon termination.

144.     Contrary to the requirements delineated in Section 12 of the MSA, and in breach of those contractual obligations, XAPT has failed to comply with its post termination obligations.

145.    Instead, XAPT and its representatives engaged in a series of acts designed to deprive Deere of property that Deere owns, holds an irrevocable license to, and/or that XAPT and its representatives agreed were Deere Confidential information.

**P.    XAPT Asserts Ownership of Property Either Owned by Or Perpetually Licensed to Deere.**

**XAPT's Assertions**

146.    XAPT's demands made on its behalf in a March 9, 2020 email ("March 9 Email"), establish that a controversy exists between Deere and XAPT regarding ownership, possession of and license to property either owned or perpetually licensed to Deere.

147.    The March 9 Email included the following demand: "Deere is required to either return or destroy all such XAPT Intellectual Property in its possession including any and all copies of code (electronic or paper), files, documents, designs, workflows and the like. Deere is also obligated to cease using or accessing the IP as contained in the environments provided under the XAPT Software Delivery Agreement."

148.    XAPT "intellectual property" is defined in MSA Section 6.3.1 as "Supplier Modifications" and "Supplier Pre-Existing Works" in MSA Section 6.2.

149.    In addition, MSA Section 12.4.1 expressly states: "Deere shall not have an obligation to return any Supplier Modifications and Supplier Pre-Existing Works for which irrevocable perpetual licenses have been granted hereunder."

150.    Further, to the extent Deere is not identified as the owner of the items demanded by XAPT, MSA Section 6.6.4 provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

29

151. XAPT's demands are contrary to the express terms of the MSA. Deere already owns or has a fully pre-paid, perpetual, irrevocable, license in and to the items demanded in the March 9 Email.

**Deere's Ownership Rights**

152. The MSA, including all exhibits, applies to all SOWs entered into between the parties.

153. The Global Template SOW is governed by the MSA, and is incorporated into the MSA.

154. The MSA applies to all Deliverables, Products and Services provided by XAPT to Deere as described in each SOW or other document executed by the parties during the term of the MSA. MSA § 1.1

155. The MSA provides for Deere's ownership of Deliverables, Products, Services and Intellectual Property provided to it by XAPT. MSA §§ 6.5.1, 1.12, 1.25 and 1.23.

156. The MSA also provides: "In addition, Supplier agrees that notwithstanding anything to the contrary set forth in this Agreement or any SOW, all application program interfaces (APIs) and other interfaces between Deere Pre-Existing Works to Supplier Pre-Existing Works, to Combined Solution and/or to Modifications created by Supplier ("Interfaces") shall be owned exclusively by Deere and shall be deemed Deere Modifications."

157. Further, pursuant to the MSA, Deere owns all Deere Pre-Existing Work, including "all Information, and any material owned or licensed by Deere as of the Effective Date or acquired by Deere after the Effective date. Any information relating to an Authorized Dealer and Deere's business and processes and information relating to gaps in requirements and features and

30

functionality relating to any Third-Party Component shall be considered Deere's Pre-Existing Works."

### Deere Holds an Irrevocable License to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Intellectual Property.

158. To the extent Deere is not identified as the owner of Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

159. Section 6.6.4. of the MSA states: "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

160. Section 18 of the SDA states:

> As contemplated by Section 6.6.4 of the MOSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

161. Section 18 of the SDA also provides:

> XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to its Authorized Dealers in connection with its Authorized Dealers

31

and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

162.    Section 18 of the SDA also provides:

In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

163.    Section 6.6.3 of the MSA provides:

To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

164.    Under MSA Section 6.6.4, Deere "shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

165.    MSA Section 12.4.1. states that Deere has no obligation to return Supplier Modifications and Supplier Pre-Existing Works for which irrevocable licenses have been granted.

**Deere's Right to Modify the Combined Solution**

166.    Further, pursuant to MSA Section 6.7, Deere has the right to modify the Combined Solution.

**The MSA Provisions on Ownership and License Survive Termination**

167.    Section 15.16 of the MSA states in relevant part: "Survival.  Upon termination of the Master Services Agreement for any reason, all provisions that by their nature should survive termination will survive and continue to be binding upon the Parties.

32

168.  Intellectual Property Rights (MSA § 6) and obligations upon Termination survive Termination. MSA § 12.4.  Section 28.12 of the SDA expressly provides that the licenses Deere holds in Section 18 to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Works survive termination. It also provides that the Confidential Information provision (SDA § 19) requiring return of Deere Confidential Information survives termination.

169.  Section 28.12 of the SDA expressly provides that the licenses to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-existing Works XAPT granted to Deere in Section 18 survive termination. It also provides that the Confidential Information provision (SDA § 19) requiring that XAPT return Deere Confidential Information also survives termination.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT
(Against XAPT)

170.  Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

171.  The parties, in exchange for valuable consideration, entered into the MSA, Global Template SOW, Governance SOW, and SDA (the Contracts), all of which are valid and enforceable.

172.  Deere fully complied with its obligations under the Contracts or has been excused from doing so.

173.  XAPT has repeatedly breached its obligations under the Contracts.

174.  More than 27 months after the parties entered into the Contracts, and after over one hundred meetings in East Moline alone, XAPT has not developed a system that includes Deere's 393 required capabilities or functionality in "Finance/Accounting, Service, Parts/Inventory, CRM, Sales and Rentals, Power Systems, and Human Resources."  Global Template SOW, § 3.1, App'x

33

A.  By the time Deere terminated the Contracts in January 2020, the Global DBS was not available for purchase by Deere dealers in a single country.

175.    XAPT multiplied, rather than closed, the gaps required to meet Deere's capability list.  To date, despite 20 monthly code deliveries, there are more than 315 gaps still to close before the DBS can be made available to dealers in Mexico, Australia, and New Zealand.

176.    XAPT has failed to meet the metrics established for system performance, including the maximum processing time thresholds for everyday dealer tasks, and has refused to work with Deere to update processing time targets, as required by Appendix E to the Global Template SOW.

177.     XAPT has neither provided the personnel necessary under the Contracts, nor used Agile product development methodology.

178.    XAPT has not followed the communication and decision lines detailed in the Governance SOW, including by seeking approval for important contract amendments from Deere employees not authorized to make such decisions.

179.    XAPT has consistently failed to meet its monthly obligation to deliver 90% of its committed deliverables.  To date, XAPT has provided the required 90% on only two of 20 monthly code deliveries.

180.    XAPT has failed to meet quality targets for its development work and has failed to deliver code meeting industry standards for quality.  XAPT's code is marred with more than 300 currently unresolved defects, and XAPT has failed to meet its published monthly defect resolution targets.

181.    XAPT has also failed to meet its representations and warranties under the Contracts.

182.    Due to extremely high defect rates and XAPT's failure to complete its development obligations, the "Product" and the "Global Template" do not "perform in accordance with the Specifications" as required by SDA § 20.1.

183.    By failing to fill important project roles, and failing to attract and retain developers who are sufficiently skilled to provide code without hundreds of significant and costly defects, XAPT has failed to "provide sufficient Representatives to perform the Services within the time frames agreed and [provide] Representatives [with] sufficient skill, knowledge and training to perform the Services" required by MSA § 10.3 and SDA § 20.3.

184.    By providing highly defective code, circumventing established communication and decision making channels, and continually seeking to obtain higher payments from Deere for the same obligations for which it originally contracted, XAPT has failed to provided services "in conformance with good professional practices and accepted industry standards" as required by MSA § 10.2 and SDA § 20.2.

185.    Despite Deere providing notice as required under the Contracts and following the parties' mutual dispute resolution process, including months of communications with the requisite Project Manager, "next level" management, and "designated leader" levels at XAPT, and a failed mediation "conducted by a mutually agreeable mediator in a mutually agreed location," XAPT has failed to cure the breaches as required pursuant to MSA §§ 10.12, 15.6.1, 15.6.2.

186.    XAPT also breached MSA § 3.6 when it utilized an unapproved subcontractor on Deere's DBS project.

187.    The Contracts contain provisions governing confidential information, procedures by which Deere must approve XAPT subcontractors, and change of control.

188.    Under the Global Template Build Statement of Work, Cosmo Consult is not an approved subcontractor to XAPT.

189.    XAPT failed to follow the applicable procedures before providing Cosmo Consult access to Deere's confidential information.

190.    Deere notified XAPT of this breach on November 1, 2019.

191.    XAPT continued to use Cosmo Consult on Deere's project without authorization.

192.    As a result of XAPT's continued failure to comply with the Contracts, Deere removed access to all @cosmoconsult.com email address on or about November 26, 2019 and again asked XAPT to comply with its obligations.

193.    Finally, on January 22, 2020, Deere put XAPT on notice that it had disregarded Deere's direct limitations on Cosmo Consult's access to its confidential information by continuing to share Deere's information with them and by allowing Cosmo Consult to work on the JD-DBS project constitutes an ongoing breach of XAPT's obligations.

194.    Deere has paid millions of dollars to XAPT, and has otherwise performed its obligations under the Contracts.

195.    Deere has suffered damages as a result of XAPT's breaches in an amount greater than $15,000,000.

### COUNT II – BREACH OF CONTRACT –
### BREACH OF POST TERMINATION OBLIGATIONS (SECTION 12 OF THE MSA)
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

196.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

197.    The MSA is valid and enforceable.

198.    Deere has fully complied with its obligations under the MSA or has been excused from doing so.

199. XAPT has repeatedly breached its post termination obligations under Section 12 of the MSA.

200. For example, MSA § 12.4.1 requires Supplier to promptly return (or at Discloser's option destroy) all applicable Discloser Confidential information and other property and materials of Discloser.

201. Among other things, XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult are required to return all Deliverables to Deere.

202. Approved subcontractors were obligated to enter into the confidentiality agreement identified as Exhibit D to the MSA and have each sign it. *See* Exhibit D to MSA, filed by XAPT under seal. Deere requested that XAPT comply with its post termination obligation on January 24, 2020, and again on March 23, 2020.

203. To date, XAPT has failed to comply with its obligation under MSA § 12.

### COUNT III – BREACH OF CONTRACT –
### RETURN OF CONFIDENTIAL INFORMATION
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

204. Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

205. The MSA is valid and enforceable.

206. Deere fully complied with its obligations under the MSA or has been excused from doing so.

207. XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult agreed to comply with the terms of the MSA, including agreeing to the terms of the confidentiality agreement in Exhibit D to the MSA. *See* Exhibit D to MSA, filed by XAPT under seal.

208. On January 24, 2020, Deere terminated the Contracts, including the MSA, for cause and requested that XAPT comply with its post termination obligations.

209.    Among other things, following termination of the Contracts, or at any time that Deere requests, Deere is entitled to the return of its Confidential Information.

210.    Again, on March 23, 2020, Deere requested that XAPT comply with its post termination obligations.

211.    Despite Deere providing notice as required under the Contracts, XAPT has not complied with its post termination obligations.

212.    Again, on March 24, 2020, Deere asked XAPT to comply with its and its approved subcontractors' post termination obligations.

213.    To date, that compliance has not occurred.

214.    XAPT is responsible for its approved subcontractors' compliance with the Contracts.

215.    Deere has suffered damages as a result of XAPT's breaches in an amount to be determinate at trial and that may not be quantifiable in monetary damages.

### COUNT IV – FRAUDULENT INDUCEMENT
(Against XAPT)

216.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

217.    As more fully set forth in Sections C and J of the Factual Background, XAPT made false statements and misrepresentations to induce Deere to choose XAPT as its Independent Software Vendor.

218.    Prior to entering into the Contracts, XAPT misrepresented that NAXT could already perform the vast majority of capabilities on Deere's list of required capabilities, either out-of-the-box or with minimal configuration.

219.    XAPT's estimate for the total cost to configure NAXT to Deere's capability list, integrated into the Contracts as Exhibit M, was $3,780,770.

220.     Deere paid over $5,392,503 in configuration costs.

221.     In addition, XAPT misrepresented that there would only be 50 development gaps to bring NAXT into line with all of Deere's required capabilities.  XAPT's list of gaps to meet Deere's required capability list has been integrated into the Contracts as Exhibit B to the Global Template SOW.

222.     XAPT's estimate for the total cost to close the gaps in Deere's capability list, integrated into the Contracts as Exhibit M, was $727,584.

223.     To bring NAXT to Deere dealers in only three of the originally anticipated and contracted-for countries—Mexico, Australia, and New Zealand—there are still more than three hundred gaps requiring development.

224.     It is impossible to create a dependable estimate of gaps to bring NAXT to Deere dealers in all seven jurisdictions due to XAPT's misrepresentation regarding their product and development abilities.

225.     So far, Deere has paid approximately $3,600,000 in gap closure development costs.

226.     XAPT represented that it could complete the entire development process in approximately 18 months.

227.     To date, after more than 27 months, the software system is not close to being fully developed and is not available to a single Deere dealer.

228.     Upon information and belief, at the time XAPT made these false statements and misrepresentations as to the configurability, gaps, cost, and project timeline, it knew they were false and/or made them with reckless indifference to the truth.

229.     On information and belief, XAPT, a self-proclaimed "global leading provider of Microsoft Dynamics ERP business solutions," with extensive experience in the industry creating

integrated software systems for "mid-size and enterprise organizations" in the heavy equipment market, was fully aware of what was required to modify its current software system to meet the capabilities list, and the time and cost needed to do so.

230. Instead, XAPT grossly misrepresented the configurability of its product, gaps, and cost in order to induce Deere to enter into lucrative, decade-long development, licensing, and servicing contracts.

231. XAPT's false statements and misrepresentations induced Deere to choose XAPT to develop its global DBS.

232. Because XAPT had extensive experience in developing integrated DBS for global implementations and up-scaling, configuring and tailoring its DBS to the needs of its customers, and had extensive knowledge and experience in the heavy equipment industry, Deere's reliance on XAPT's false statements and misrepresentations was reasonable.

233. As a result of XAPT's misrepresentations, Deere has been injured in an amount exceeding $48,000,000.

## COUNT V – REFORMATION
(Against XAPT)

234. Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

235. As more fully set forth in Section I of the Factual Background, the parties' true agreement in Amendment 1 was for its appendices to add additional information to the appendices in the Global Template SOW, for example, to reflect the fact that XAPT had failed to originally identify the correct gaps in order to meet the list of capabilities in Appendix A to the Global Template SOW.

236.    Contrary to the parties' agreement, the text of Amendment 1 provided that its appendices would "replace" those in the Global Template SOW.  Deere executed Amendment 1 believing that its appendices would not narrow the scope of the project.

237.    XAPT knew the language of Amendment 1 did not align with the parties' agreement and Deere's expectation because: (a) XAPT sought approval for Amendment 1 from Deere employees not authorized to make such decisions, in violation of the Governance SOW; and (b) when Deere asked Popovic whether he knew of the mistake, he stated that "of course" he knew.

238.    Deere therefore seeks reformation of Amendment 1 to reflect the parties' agreement that the appendices to Amendment 1 be added to, rather than replaced by, the appendices to the Global Template SOW.

### COUNT VI – DECLARATORY RELIEF
(Against XAPT)

239.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

240.    An actual controversy exists between Deere and XAPT regarding XAPT's claims of an ownership interest in property rights in and to all Deere Pre-Existing IP, Deliverables and Deere Modifications acquired and owned and/or licensed by Deere under the Contracts.  Such claims by XAPT have thwarted Deere's legitimate use of its property rights under the Contracts.

241.    Deere is the owner of all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications as provided for in MSA § 6.1.

242.    The term "Deliverables" is defined in MSA §1.12. "Deliverable" or "Deliverables" means "those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools,

41

and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software[1] and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf."

243.  Deere's ownership rights were irrevocably assigned by XAPT in perpetuity to Deere, and XAPT is required to have its Representatives assign to Deere, all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications.

244.  The assignment was effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

245.  XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult do not have any ownership right in including any Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

246.  XAPT and its Representatives' assertions of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including demands for return or demands for Deere not to use Deere Pre-Existing IP,  Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

247.  Deere has no obligation to return Deere's Pre-Existing Intellectual Property, Deliverables or Deere Modifications.

---

[1] Software is defined in the MSA to mean "Supplier's software products (including each module, component, and function described in the applicable SOW), including the Combined Solution and any Upgrades, new releases and documentation for the Combined Solution." Modification means a modification, customization or localization of the Combined Solution, including any associated update (as defined in the SDA)."  MSA §§ 1.26 and 1.18.

248. XAPT and its Representatives' demands that Deere not use, and XAPT and its Representatives threats of enforcement of ownership rights in and to, all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

249. Deere is not obligated to comply with those demands.

250. Non-compliance with those demands is not a breach of Deere's obligations under its agreements with XAPT or its representatives.

251. Deere also holds and irrevocable license to Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing Intellectual Property under the Contracts.

252. To the extent Deere is not identified as the owner, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license.

253. XAPT improperly demanded that Deere not use Supplier Modifications and Supplier Pre-Existing IP under the Contracts. MSA § 12.4.1 expressly states that Deere is not required to return Supplier Modifications and Supplier Pre-Existing IP for which irrevocable perpetual licenses have been granted thereunder.

254. XAPT and its Representatives' demands that Supplier Modifications and Supplier Pre-Existing IP not be used by Deere are improper because Deere and its Affiliates have a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non-exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage

Modifications, and Supplier Pre-existing IP in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

255.    Deere is not obligated to comply with XAPT's demands.

256.    Deere's non-compliance with XAPT's demands is not a breach of Deere's Obligations under its agreements with XAPT or its Representatives.

257.    XAPT and its Representatives' demands that Supplier Modifications and Supplier Pre-Existing Works be returned are improper because MSA § 12.4.1 expressly provides that Deere does not have an obligation to return Supplier Modifications or Supplier Pre-existing Works for which irrevocable perpetual licenses have been granted.

258.    Deere is not obligated to comply with XAPT's demands.

259.    Deere's non-compliance with XAPT's demands is not a breach of Deere's obligations under its Contracts with XAPT or its Representatives.

260.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo each have a contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement in Exhibit D to the MSA.  *See* Exhibit D to MSA, filed by XAPT under seal.

261.    Deere has a right to immediate possession of Deere Confidential Information.

262.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo's failure to return Deere Confidential Information is a breach of their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

### COUNT VII – INJUNCTIVE RELIEF & SPECIFIC PERFORMANCE
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

263.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

264.     Deere seeks specific performance under Section 12 of the MSA.

265.     Deere has complied with all of terms of the MSA.  To the extent Deere has not yet complied with any terms of the MSA, it stands ready, willing, and able to perform any outstanding obligations.

266.     In additional to XAPT's contractual obligations, XAPT's approved subcontractors have obligations under Section 6.13.7.

267.     Approved subcontractors are required to have each of their representatives individually sign the Confidential Information Agreement attached to the MSA as Exhibit D.  *See* Exhibit D to MSA, filed by XAPT under seal.

268.     Pursuant to the post-termination provisions of MSA § 12.4, XAPT is required to return Deere Confidential Information, deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

269.     Pursuant to their respective contractual obligations, XAPT, XAPT Kft, and XAPT Solutions and Cosmo are required to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

270.     XAPT, XAPT Kft, and XAPT Solutions and Cosmo do not have ownership interests in all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications as defined by the contracts between the parties.

271.     XAPT, XAPT Kft, and XAPT Solutions and Cosmo are not permitted to interfere with Deere's use of intellectual property right irrevocably licensed to Deere.  Specifically, in Section 6.6.4. "Deere shall have the rights and licenses to use the Supplier Modifications,

Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

272.    XAPT, XAPT Kft, and XAPT Solutions, and Cosmo have failed or refused to perform their contractual obligation to return Deere Confidential Information, deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

### COUNT VIII – CONVERSION
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

273.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

274.    Under the Contracts, Deere has a right to the Deliverables and Deere Confidential Information.

275.    Pursuant to MSA § 6.13.2, the Deliverables are Deere's Confidential Information. Section 6.13.2 states: "This Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information."

276.    Following termination of the Contracts, XAPT is required to provide Deere with the Deliverables along with Deere Confidential Information.

277.    XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult have, without authorization, wrongfully assumed control, dominion, and/or ownership over the Deliverables and Deere Confidential Information.

278.    Despite Deere's multiple requests asking XAPT to comply with its contractual obligations, XAPT has willfully and without justification failed to provide Deere with this material.

## COUNT IX – REPLEVIN
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

279.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

280.    The Contracts provide that Deere owns the Deliverables and Deere Confidential Information and has a right to this property.

281.    Deere also has the right to immediate possession of the Deliverables and Deere Confidential Information.

282.    Deere has the ownership and/or the right to immediate possession of the Deliverables and Deere Confidential Information.

283.    Pursuant to MSA § 6.13.2, the Deliverables are Deere's Confidential Information. Section 6.13.2 states: "This Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information."

284.    XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult have no right to possess the Deliverables and Deere Confidential Information.

285.    On information and belief, to date, XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult still wrongfully possess this information.

286.    In addition to possession, Deere seeks an order instructing XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult not to intentionally destroy, sell, or secrete the information.

## COUNT X – ALTER EGO
(Against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult)

287.    Deere incorporates by reference paragraphs 1–169 as though fully stated herein.

288.    XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult share a unity of interest and/or control.

47

289.     Recognition of individual corporate forms between XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult would promote injustice, inequity and/or fraud.

290.     Upon information and belief, corporate formalities have not been observed between XAPT, XAPT Kft, XAPT Solutions, and/or Cosmo Consult.

291.     Upon information and belief, XAPT is a mere instrumentality or façade for XAPT Kft, XAPT Solutions and Cosmo Consult.

292.     XAPT Solutions put out a press release dated September 17, 2019 on https://www.cosmoconsult.com/news/2019/acquisition-xapt-solutions/ with a headline that reads "COSMO CONSULT ACQUIRES XAPT SOLUTIONS." Exhibit 1.

293.     XAPT and XAPT personnel were utilizing the email address @cosmoconsult.com.

294.     Upon information and belief, XAPT employees were interchangeable with those of Cosmo Consult.

295.     In that same timeframe, Deere learned of the press release.

296.     Initially, XAPT contended that "[Cosmo Consult] is the same consultants as it [*sic*] was approved on July 24th, 2018, the company is also still called XAPT Kft. However, the ownership has changed but no new resources have been added and the resources assigned is [*sic*] the same that Deere approved in July of 2018."

297.     Shifting its position, XAPT later contended that: "Our approved subcontractor "S.C. XAPT Solutions SRL" changed its name to "COSMO CONSULT BUSINESS SOLUTION S.R.L.". This change has no impact on our contractual relationship with them. Please find attached documentation confirming that it is the same legal entity."

298.     Upon information and belief, the alleged transactions conducted between the entities were not made in good faith and/or on commercially reasonable terms.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Deere & Company respectfully requests that this Court finds in its favor and against Defendant as follows:

A.      Enter judgment for Plaintiff and against XAPT on Count I;

B.      Award damages in an amount to be determined at trial, in the amount of $15,000,000 under Count I;

C.      Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count II;

D.      Award damages in an amount to be determined at trial, in the amount of $15,000,000 under Count II;

E.      Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count III;

F.      Award damages in an amount to be determined at trial under Count III;

G.      Enter judgment for Plaintiff and against XAPT on Count IV;

H.      Award damages in an amount to be determined at trial, in excess of $48,000,000 under Count IV;

I.      Enter judgment for Plaintiff and against XAPT on Count V;

J.      Award reformation of Amendment 1 to state that the appendices to Amendment 1 be added to, rather than "replace," the appendices to the Global Template SOW;

K.      Enter judgment for Deere and against XAPT on Count VI, granting the following declaratory relief:

1.  DEERE'S OWNERSHIP RIGHTS

49

a. Deere is the owner of all right, title and interest, including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications. MSA § 6.1.

b. Deliverables is defined in MSA §1.12. "Deliverable" or "Deliverables" means those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

c. Deere's ownership rights were irrevocably assigned by XAPT in perpetuity to Deere, and XAPT is required to have its Representatives assign to Deere all worldwide right, title and interest in all IPR in the Deliverables (other than Supplier Modifications) and Deere Modifications.

d. The assignment is effective immediately upon creation of the Deliverables (other than Supplier Modifications) and Deere Modifications, without the need for further consideration or written agreement among the Parties.

e. XAPT, XAPT Kft, XAPT Solutions and Cosmo do not have an ownership right in including any Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

50

  f. XAPT and its Representatives' assertion of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return or Demands for Deere not to use Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, is improper.

2. **DEERE HAS NO OBLIGATION TO RETURN DEERE PRE-EXISTING IP, DELIVERABLES, AND DEERE MODIFICATIONS.**

  a. XAPT and its Representatives demand that Deere not use, and XAPT and its Representatives' threats of enforcement of ownership rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, including Demands for return Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications, are improper.

  b. Deere is not obligated to comply with those demands.

  c. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its representatives.

3. **DEERE HOLDS AN IRREVOCABLE LICENSE TO SUPPLIER MODIFICATIONS, COMPETITIVE ADVANTAGE MODIFICATIONS AND SUPPLIER PRE-EXISTING IP.**

  a. To the extent Deere is not identified as the owner, the MSA provides Deere with a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable and non-exclusive license as set forth in MSA § 6.6.4.

    i. Section 6.6.4. states: "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

ii. Section 18 of the SDA States: "As contemplated by Section 6.6.4 of the MSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

52

iii.     Section 18 of the SDA also provides: XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to its Authorized Dealers in connection with its Authorized Dealers and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

iv.     Section 18 of the SDA also provides: "In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

v.     In addition, MSA§ 6.6.3, it provides: To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

53

4. XAPT'S DEMAND THAT DEERE NOT USE SUPPLIER MODIFICATIONS AND SUPPLIER PRE-EXISTING WORKS IS IMPROPER

   a. XAPT and its Representatives demand that Supplier Modifications and Supplier Pre-existing works not be used by Deere are improper because Deere and its Affiliates have a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work.

   b. Deere is not obligated to comply with those demands.

   c. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its Representatives.

5. DEERE HAS NO OBLIGATION TO RETURN SUPPLIER MODIFICATIONS AND SUPPLIER PRE-EXISTING WORKS

   a. MSA § 12.4.1 expressly provides that Deere does not have an obligation to return Supplier Modifications or Supplier Pre-existing Works for which irrevocable perpetual licenses have been granted. MSA § 12.4.1.

   b. XAPT and its Representatives demand that Supplier Modifications and Supplier Pre-existing works be returned are improper.

   c. Deere is not obligated to comply with those demands.

   d. Deere's non-compliance with those demands is not a breach of Deere's Obligations under its agreements with XAPT or its representatives.

54

6. **XAPT AND ITS REPRESENTATIVES HAVE AN OBLIGATION TO RETURN DEERE CONFIDENTIAL INFORMATION**

   a. XAPT, XAPT Kft, and XAPT Solutions and Cosmo each have a contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

   b. The Master Agreement, any Personal Data, Deere Modifications, Modifications Created by Deere, Deere Pre-Existing Works, Deere Data, and all Deliverables (other than Supplier Modifications) will be considered Deere Confidential Information.

   c. Deliverables is defined in MSA §1.12. "Deliverable" or "Deliverables" means those Deliverables defined in a SOW, as well as any work product, modules, applications, code, application program interfaces (API's), other interfaces between Deere Pre-existing Works to Supplier Pre-existing Works, to Combined Solution and/or to Modifications, technology, tools, and other results of Services. Deliverables shall exclude the Combined Solution but shall include all Modifications of the Software and any equipment, hardware, or other items, materials developed and/or procured by Supplier on Deere's behalf.

   d. Deere has a right to immediate possession of Deere Confidential Information.

   e. XAPT, XAPT Kft, and XAPT Solutions and Cosmo's failure to return Deere Confidential Information is a breach of their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1

and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

L.     For Count VII, for Injunctive Relief and Specific Performance, enter Judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions and Cosmo Consult and order the following specific enforcement and injunctive relief relating to XAPT's Post Termination obligations and obligations to return its Deere Confidential Information:

1. An Order requiring XAPT to comply with its post Termination provisions MSA § 12.4 to Return Deere Confidential Information, Deliver the Deliverables, cooperate with Deere, and cease interference with Deere's License.

2. An Order requiring XAPT, XAPT Kft, and XAPT Solutions, and Cosmo to return Deere Confidential Information pursuant to their respective contractual obligation to return Deere's Confidential Information under MSA §§ 12.4.1 and 6.13.7, and/or as a result of its employees having signed the Confidential Information Agreement.

3. An order enjoining XAPT, XAPT Kft, and XAPT Solutions, and Cosmo from asserting any ownership interest in including all Intellectual Property Rights in and to all Deere Pre-Existing IP, Deliverables (other than Supplier Modifications) and Deere Modifications.

4. An order enjoining XAPT, XAPT Kft, and XAPT Solutions, and Cosmo from interfering with Deere's use of intellectual property right irrevocably licensed to Deere.  Specifically, in Section 6.6.4. "Deere shall have the rights and licenses to use the Supplier Modifications, Competitive Advantage Modifications and Supplier Pre-Existing IP as set forth in Section 18 of the SDA."

a.  Section 18 of the SDA States: "As contemplated by Section 6.6.4 of the MSA, in addition to the rights and licenses to Supplier Modifications and Competitive Advantage Modifications as granted in Section 2 of this Agreement, to the extent XAPT or any Representative (i) develops or configures any Deliverable, Deere Modifications, and or Deere Pre-existing Work such that the use or other exploitation of such Deliverable, Deere Modifications, and/or Deere Pre-existing Work is dependent upon any Supplier Modification, Competitive Advantage Modifications and/or Supplier Pre-Existing Work or (ii) embeds, installs, or incorporates any Supplier Modifications, Competitive Advantage Modification, and / or Supplier Pre-existing work into any Deliverable, Deere Modifications, and or Deere Pre-existing Work, at its sole expense, XAPT hereby grants to Customer and its Affiliates a worldwide, fully paid up, royalty free, perpetual, irrevocable, transferable, and non-exclusive license to use, execute, transmit, display, perform, modify, reproduce, and distribute (within Customer, its Affiliates, and Authorized Dealers) Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works in connection with Customer, its Affiliates, and Customer Users use of the Deliverables, Deere Modifications, and/or Deere Pre-existing Work. "

b.  Section 18 of the SDA also provides: XAPT further agrees that Customer shall have the right to grant sublicenses to such Supplier Modifications, Competitive Advantage Modifications, and Supplier Pre-existing Works to

its Authorized Dealers in connection with its Authorized Dealers and Dealer Users use of the Deliverables; provided that the Authorized Dealers shall have no right to further sublicense of Supplier Modifications, Competitive Advantage Modifications, and/or Suppliers Pre-existing Work.

c. Section 18 of the SDA also provides: "In addition and notwithstanding anything to the contrary set forth in this Agreement, Customer shall have the right to use and share and grant access to its Representatives, service providers and contractors to features, functionality, requirements, design documents, and specifications relating to Supplier Modifications and/or Competitive Advantage Modifications.

d. In addition, MSA § 6.6.3 provides: To the extent that Supplier or any Representative (i) develops or configures any Deliverable and/or Deere Pre-Existing Work such that the use or other exploitation of such Deliverable and/or Deere Pre-Existing Work is dependent upon any Supplier Pre-Existing Work, or (ii) embeds, installs, or incorporates any Supplier Pre-Existing Work into any Deliverable and/or Deere Pre-Existing Work, such Supplier Pre-Existing Work is licensed to Deere under the SDA.

M. Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on its claim for conversion under Count VIII and order return of Deere Confidential Information;

N. Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on its claim for replevin under Count IX; order return of Deere Confidential Information; and order defendants not to intentionally destroy, sell, or secrete the information.

O.  Enter judgment for Plaintiff and against XAPT, XAPT Kft, XAPT Solutions, and Cosmo Consult on Count X;

P.  Award damages in an amount to be determined at trial under Count X; and

Q.  Granting such other and further relief on each Count I to X as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff Deere & Company hereby demands a trial by jury on all issues so triable.

Dated:  March 27, 2020

/s/ *Mariangela M. Seale*

Matthew Fischer
Mariangela Seale
Lauren Jaffe
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (tel)
(312) 471-8701 (fax)
mfischer@rshc-law.com
mseale@rshc-law.com
ljaffe@rshc-law.com

Kara E. F. Cenar *(Admission app. filed contemporaneously herewith)*
S. Patrick McKey
GREENSFELDER, HEMKER & GALE, P.C
200 West Madison Street, Suite 3300
Chicago, Illinois 60606
(312) 419.9090 (tel)
(312) 419.1930 (fax)
kcenar@greensfelder.com
pmckey@greensfelder.com

Mary Ann L. Wymore *(Admission app. filed contemporaneously herewith)*
Ronnie L. White II *(Admission app. filed contemporaneously herewith)*
GREENSFELDER, HEMKER & GALE, P.C
10 S. Broadway, Suite 2000
St. Louis, Missouri 63102

(314) 241.9090 (tel)
(314) 241.8624 (fax)
mlw@greensfelder.com
rwhite@greensfelder.com

*Attorneys for Plaintiff Deere & Company*

4:19-cv-04210-SLD-JEH # 60 Page 62 of 65

# Exhibit 1



Acquisition XAPT Solutions

**CRM, ERP, PRESS RELATION**

# COSMO CONSULT ACQUIRES XAPT SOLUTIONS

**Gero Brinkbäumer**

**09/17/2019**

**The COSMO CONSULT Group, an internationally active provider of digital transformation services and end-to-end business solutions based on Microsoft Dynamics, has acquired XAPT Solutions, the leading Microsoft ERP- and CRM-partner in Hungary and Romania.**

# Integrating two market leaders

With 150 employees in <u>Hungary</u> and <u>Romania</u>, XAPT Solutions is the market leader for Microsoft business solutions there. Until now, the company was part of XAPT Software, an internationally active Microsoft solutions provider with which COSMO CONSULT has agreed on a comprehensive partnership in addition to the acquisition.

With XAPT Solutions, the COSMO CONSULT group is integrating a Dynamics pioneer that has expertise in the complete <u>Microsoft product portfolio</u> from Dynamics 365 to Office 365 and Power BI to Azure-based cloud infrastructures. XAPT Solutions also offers various industry solutions and special solutions that are used by well-known industrial companies around the world.

 **Digital Maturity Check**

**Compare benchmarks** now and get consulting. We offer you a **free online survey** that enables an initial analysis of your **digital business processes** - holistically or departmentally.

<u>Go to Digi-Check</u>

# Great potential in Eastern Europe

The integration of XAPT Solutions into the COSMO CONSULT group is a further milestone in the growth strategy of the largest Microsoft <u>digital transformation partner</u> in Europe, one that has been expanding its business most recently through acquisitions in Germany, Austria, France and Spain. With a total of 1,200 employees, COSMO CONSULT will now be represented with its own branches in the emerging Eastern European markets.

Local companies in Hungary and Romania will be able to benefit from the combined range of products and services offered by the two leading technology providers and from their precise knowledge of local market conditions, and so will international customers wishing to expand their business in Eastern Europe.

## Partner for digital transformation

"With its comprehensive, international Microsoft expertise, XAPT Solutions fits perfectly into our group," explains **Uwe Bergmann**, CEO of COSMO CONSULT. Eastern Europe has extremely interesting places to do business - with dynamic growth and great investment potential. It is important to us to be there with our own resources, to be there for our customers with all of COSMO's expertise."

But there's even more to it, says Uwe Bergmann: "Especially in times of great changes, such as the ongoing digital transformation, you need a strong IT partner who not only knows what to do, but is also going to be there for the long haul. By bringing together two market leaders under a common roof at COSMO CONSULT, our customers can be sure to have the strongest Microsoft partner for digital transformation in Europe at their side."

## Tags



**#insidecosmo**    **Data & Analytics**    **Digitization**    **Microsoft Dynamics 365**

**CRM**    **Microsoft Azure**